Opinión disidente emitida por el
Juez Asociado Señor Rivera Pérez.
Mediante el presente caso, la Mayoría invade las facul-tades de gobierno propio que disfrutan los partidos políti-cos bajo el esquema democrático contenido en la Constitu-ción de Puerto Rico. La opinión mayoritaria interviene en forma impermisible con la amplia discreción de los parti-dos políticos para formular e interpretar su reglamenta-ción interna y resolver sus disputas al amparo de la *910 misma. La Mayoría interviene en un asunto que exige res-tricción judicial porque no está bajo el poder de los tribu-nales decidir y determinar cuál es el cuadro de aspirantes en una primaria interna de un partido político.
Hoy, este Tribunal ha decidido que determinados sena-dores electos bajo la insignia del Partido Nuevo Progre-sista tienen el derecho a ser aspirantes en una primaria interna de ese partido político, cuando esa colectividad en-tiende que han violado su Declaración de Propósitos, sus reglamentos y los acuerdos y las decisiones de sus organis-mos rectores, todo en violación a una declaración de fideli-dad —prestada bajo juramento— mediante la cual se com-prometieron a cumplir con los mismos para representar a ese partido político en el Senado de Puerto Rico. Por enten-der que los tribunales de Puerto Rico, por impedimento constitucional, no tienen facultad alguna para formular opinión o adjudicar tal asunto, DISENTIMOS.
I
El Hon. Jorge De Castro Font (Senador De Castro Pont), la Hon. Migdalia Padilla Alvelo (Senadora Padilla Alvelo), la Hon. Luz Z. Arce Ferrer (Senadora Arce Ferrer), y el Hon. Carlos A. Díaz Sánchez (Senador Díaz Sánchez), quienes llamaremos, en conjunto, los Senadores, fueron electos bajo la insignia del Partido Nuevo Progresista (P.N.P.) en los comicios electorales celebrados el 2 de no-viembre de 2004.
Tal y como dispone el Art. 16 del Reglamento del P.N.P, se emitió una convocatoria, publicada en la prensa escrita, en la cual se invitó a todos sus miembros a asistir a la celebración de la Asamblea General el domingo 15 de mayo de 2005, a las 10:30 A.M., en el Coliseito Pedrín Zorilla.
El 15 mayo de 2005, la Asamblea General del P.N.P. aprobó una Resolución en la cual se le instruyó a los sena-dores del Caucus electos por ese partido a elegir al hono- *911 rabie Pedro Rosselló González (Senador Rosselló Gonzá-lez), Presidente del Senado de Puerto Rico (el Senado).
El 26 de mayo de 2005, el Caucus Senatorial del P.N.P. acordó, por una mayoría de los Senadores miembros de ese Caucus, acatar el mandato de la Resolución aprobada en la Asamblea General del 15 de mayo de 2006 y proceder a elegir al Senador Rosselló González a la posición de Presi-dente del Senado. Ninguno de los Senadores acató el man-dato de dicha resolución.
El 7 de junio de 2005 se presentó una querella en contra del Senador De Castro Font ante el Directorio del P.N.P. (el Directorio). El Directorio determinó declarar al Senador De Castro Font como persona non grata en el P.N.P, des-tituirlo de toda posición de liderato, suspenderlo sumaria y permanentemente como miembro de ese partido, prohibirle participar en los organismos del P.N.P. y recomendarle a la Asamblea General de ese partido político su expulsión.
El 8 de junio de 2005, el licenciado Rivera Schatz le informó, por escrito, al Senador De Castro Font, las deter-minaciones del Directorio antes descritas, y le informó que se le concedía un término de cinco días para apelar tal decisión.
Oportunamente, el Senador De Castro Font apeló la de-terminación del Directorio. Alegó, entre otras cosas, que no se le proveyó oportunidad de enfrentarse a la querella pre-sentada en su contra antes de que el Directorio le impu-siera las sanciones en su contra. Indicó, además, que tal organismo violentó su derecho a un debido proceso de ley y su derecho a la libertad de expresión.
El 1 de julio de 2005 se celebró una reunión del Direc-torio, en la cual se declaró no ha lugar la apelación presen-tada por el Senador De Castro Font y se decidió mantener en pleno vigor las determinaciones del 7 de junio de 2005 en contra de éste.
En esa misma reunión, el licenciado Rivera Schatz pre-sentó una querella en contra del Hon. Kenneth McClintock Hernández, Presidente del Senado (Senador McClintock *912 Hernández), del Hon. Orlando Parga Figueroa, Vicepresi-dente del Senado (Senador Parga Figueroa), y de los Sena-dores Arce Ferrer, Padilla Alvelo y Díaz Sánchez. Se les imputó “haber desafiado [á\ los organismos rectores del partido, a saber, [l]a Asamblea General de Delegados, el Directorio y el propio Caucus del Partido en el Senado”. Además, se indicó que los Senadores querellados no habían “tenido deferencia o respeto alguno por el electorado que ¿o[s] eligió como senadores, discutiendo públicamente asun-tos del Partido y distanciándose de las decisiones de la colectividad”. El Directorio acogió la querella. Se deter-minó declararlos incursos en violaciones al Reglamento del P.N.P, relevarlos de toda posición de liderato en el partido, suspenderlos sumaria y permanentemente como miembros de los organismos del partido y prohibirles participar como candidatos bajo la insignia de esa colectividad política.
El 5 de julio de 2005, el licenciado Rivera Schatz le no-tificó al Senador De Castro Font que la recomendación del Directorio de expulsarlo del partido sería atendida en la Asamblea General de Delegados del P.N.P. que se celebra-ría el 14 de agosto de 2005.
El 5 de julio de 2005, el licenciado Rivera Schatz le no-tificó a los Senadores McClintock Hernández, Parga Figueroa, Arce Ferrer, Padilla Alvelo y Díaz Sánchez que ten-drían cinco días para apelar la decisión del Directorio.
El 8 de julio de 2005, los Senadores McClintock Hernán-dez, Arce Ferrer, Padilla Alvelo, Parga Figueroa y Díaz Sánchez presentaron un alegato ante el Directorio del P.N.P. Alegaron, entre otras cosas, que ellos no habían co-metido las faltas imputadas y que el partido no podía im-ponerles sanciones bajo el palio del artículo 8 del Regla-mento, puesto que ellos no eran oficiales de dicha colectividad política. Indicaron, además, que el organismo apropiado para dilucidar la querella presentada en su contra era el Comité de Conciliación del P.N.P. Adujeron, tam-bién, que al imponerles las sanciones apeladas se violentó su derecho a un debido proceso de ley.
*913 El 10 de agosto de 2005, el licenciado Rivera Schatz les notificó a los Senadores De Castro Font, Padilla Alvelo, Díaz Sánchez, McClintock Hernández y Arce Ferrer que se les había concedido una vista evidenciaría con relación a las sanciones que fueron recomendadas en su contra y aprobadas por el Directorio del P.N.P. Dicha vista se cele-braría el 14 de agosto de 2005 ante la Asamblea General.
El 14 de agosto de 2005 se celebró la Asamblea General de Delegados del P.N.P. Ninguno de los Senadores asistió a la misma. En dicha asamblea se expulsó de ese partido al Senador De Castro Font y se reafirmaron las sanciones impuestas en contra de los otros Senadores. Además, la Asamblea General adoptó un nuevo Reglamento para regir los procedimientos internos de esa colectividad política.
El 7 de marzo de 2006, el licenciado Rivera Schatz pre-sentó ante el Directorio una nueva querella en contra de los Senadores aquí peticionarios. Se alegó, entre otras co-sas, que los Senadores habían mantenido una actitud de desafío a la Asamblea General y al Directorio del P.N.P., así como al Caucus de este partido político en el Senado. Se indicó, además, que los Senadores habían traicionado los postulados del P.N.P. A raíz de esto, se le solicitó al Direc-torio de esa colectividad política que expulsara del partido a los Senadores McClintock Hernández y Parga Figueroa; y que se censurara a los Senadores Díaz Sánchez, Arce Ferrer y Padilla Alvelo.
El 8 de marzo de 2006, el licenciado Rivera Schatz le informó al Senador McClintock Hernández la determina-ción del Directorio de expulsarlo del P.N.P. Se le concedió un término de cinco días para “solicitar audiencia ante la Asamblea para defenderse de las alegaciones y determina-ción en su contra”.
El 13 de marzo de 2006, el Senador McClintock Hernán-dez envió una carta al licenciado Rivera Schatz en la que negó las violaciones que se le imputaron.
El 16 de marzo de 2006, el licenciado Rivera Schatz le envió una carta al Senador McClintock Hernández para *914 indicarle que su Carta de 13 de marzo de 2006 sería aco-gida como una apelación para ser discutida en la Asamblea General del P.N.P.
El 21 de marzo de 2006, el Senador McClintock Hernán-dez le envió una carta al licenciado Rivera Schatz me-diante la que alegó que la Asamblea General del P.N.P. no era el foro que estipulaba el Reglamento para considerar una apelación de un dictamen del Directorio. Solicitó, ade-más, que el asunto se viera en el Comité de Conciliación. El licenciado Rivera Schatz rechazó esta última solicitud e indicó que la Asamblea General era el cuerpo con potestad para tramitar la apelación presentada por el Senador Mc-Clintock Hernández.
El 10 de agosto de 2006, el licenciado Rivera Schatz citó al Senador McClintock Hernández a comparecer a la Asamblea General del partido que se celebraría el 20 de agosto de 2006. Se le indicó, además, que en dicha Asam-blea se le permitiría argumentar y presentar prueba a su favor.
El 11 de agosto de 2006, el Senador McClintock Hernán-dez le envió una carta al licenciado Rivera Schatz para informarle que no asistiría a la Asamblea General a cele-brarse el 20 de agosto de 2006.
El 20 de agosto de 2006 se celebró la Asamblea General del P.N.P. Ninguno de los Senadores acudió a la misma. Dicha Asamblea discutió las sanciones recomendadas y las adoptó.
El 29 de marzo de 2007, el licenciado Rivera Schatz emi-tió una certificación de la decisión de la Asamblea General por la cual se expulsó del P.N.P. a los Senadores De Castro Font, McClintock Hernández y Parga Figueroa. Se acre-ditó, además, que las Senadoras Arce Ferrer y Padilla Al-velo y el Senador Díaz Sánchez no podrían figurar como candidatos bajo la insignia del partido ni ocupar posiciones de liderato en esa colectividad política.
El 29 de marzo de 2007, los Senadores McClintock Her-nández, De Castro Font, Arce Ferrer, Díaz Sánchez y Pa *915 dilla Alvelo presentaron una petición de interdicto prelimi-nar y permanente ante el Tribunal de Primera Instancia. Alegaron, entre otras cosas, que las sanciones impuestas eran nulas y contrarias a la Ley Electoral de Puerto Rico.(1) (Ley Electoral). Indicaron, además, que el P.N.P. había vio-lentado las garantías que la Ley Electoral proveía a los electores afiliados a un partido.
El 10 de abril de 2007, el licenciado Rivera Schatz, en capacidad de Comisionado Electoral y Secretario General del P.N.P, presentó una Moción de Desestimación y/o Sen-tencia Sumaria. Alegó, entre otras cosas, que el recurso de injunction no era el adecuado para revisar la decisión dis-ciplinaria tomada por un partido político. Argumentó, ade-más, que los Senadores no probaron que sufrieran un daño irreparable de no concederse el remedio de interdicto y que estaban impedidos de solicitar dicho remedio por haber in-currido en incuria y falta de diligencia.
El 12 de abril de 2007, el Tribunal de Primera Instancia declaró no ha lugar la Moción de Desestimación y/o Sen-tencia Sumaria por entender que los asuntos considerados en el caso de autos eran justiciables.
El 8 de mayo de 2007, el Tribunal de Primera Instancia dictó una sentencia sumaria en la que declaró con lugar la demanda y concedió el remedio de interdicto solicitado por los Senadores. En su sentencia, el foro primario determinó que el P.N.P. violó las disposiciones de su Reglamento sobre el procedimiento a seguir al imponer sanciones disciplina-rias a sus miembros. Sostuvo, además, que la decisión de la Asamblea General que le ordenó a los Senadores del caucus del P.N.P. a elegir como Presidente del Senado al Hon. Pedro Rosselló González, no era una cuestión programá-tica o reglamentaria. Concluyó, además, que las sanciones impuestas a los Senadores eran nulas por contravenir la Ley Electoral y que no se les podía prohibir solicitar parti-cipar en las primarias del P.N.P.
*916 Inconforme, el 17 de mayo de 2007, el licenciado Rivera Schatz presentó un escrito de apelación ante el Tribunal de Apelaciones y, a la misma vez, una solicitud de certifica-ción ante nos.
El 22 de mayo de 2007 expedimos el auto de certifica-ción y le concedimos a las partes un término simultáneo para presentar sus respectivos alegatos.
El 12 de junio de 2007 emitimos la opinión, McClintock v. Rivera Schatz, 171 D.RR. 584 (2007). Este Tribunal declaró nulas las sanciones impuestas por el P.N.P. a los Se-nadores McClintock Hernández, De Castro Font y Díaz Sánchez, así como las impuestas a las Senadoras Arce Fe-rrer y Padilla Alvelo. Durante junio de 2007, los Senadores presentaron ante el P.N.P. sus intenciones de candidaturas.
El 19 de junio del 2007, el licenciado Leo Díaz Urbina, la Hon. Lourdes Ramos Rivera, Representante a la Camára (Representante Ramos Rivera), y el Hon. Carlos Pagán González, Senador (Senador Pagán González), presentaron una querella contra la Senadora Padilla Alvelo y el Sena-dor De Castro Font ante el Comité de Evaluación de Aspi-rantes a Cargos Públicos del P.N.P. (el Comité). En ella se imputaron los cuarenta y ocho cargos siguientes:
1. Desacataron la Resolución de la Asamblea General y los acuerdos del Directorio y del caucus del PNP en crasa viola-ción a los Artículos 3,5,8,45 y 78 del Reglamento del PNP e igualmente violaron su juramento en la Declaración de Fide-lidad y Declaración Jurada de Candidatos del PNP.
2. Mediante la utilización de artimañas parlamentarias y re-glamentarias, y en unión a los miembros de la minoría del PPD, despojaron de la portavocía del Senado a uno de los miembros de la mayoría senatorial compuesta por los once (11) Senadores del PNP que acataron los mandatos del caucus y de la Asamblea General.
3. Tan reciente como el 18 de junio de 2007, se unieron y con-fabularon con la delegación del PPD y en contra de los man-datos claros y precisos, tanto de la conferencia legislativa como del caucus del Senado del PNP, aprobaron el Proyecto del Senado 2112 (incentivos industriales).
*917 4. Despojaron, caprichosa y arbitrariamente, de la Presiden-cia de las Comisiones Senatoriales a aquellos Senadores del PNP que acataron las decisiones del caucus y de la Asamblea General.
5. Realizaron cambios de forma arbitraria en la composición de las Comisiones Senatoriales.
6. Enmendaron el Reglamento del Senado en unión a la mi-noría del partido de oposición para impedir la consideración de una moción para cambios en la Presidencia del Senado.
7. Incurrieron en faltas continuas de respeto y atropellos en contra de la delegación mayoritaria del PNP, a sus portavoces, y al Presidente del PNP, incluyendo la aplicación de la mor-daza de la “previa” a este último.
8. Limitaron continuamente la expresión de los miembros de la delegación del PNP en el hemiciclo del Senado (turnos es-peciales y debates).
9. En alianza con el partido de oposición -Partido Popular De-mocrático- impidieron la creación de la Comisión de Status, prioridad ideológica del PNP.
10. Imposibilitaron continuamente el acceso a los asesores de la delegación del PNP en el hemiciclo, limitando el trabajo legislativo de la delegación del PNP.
11. Cancelaron, caprichosa y arbitrariamente, contratos de asesores de la delegación del PNP.
12. Las constantes alianzas y conspiraciones con los miem-bros del partido de minoría (PPD) y en perjuicio del trabajo legislativo del PNP, se realizaban para evitar el posible dis-gusto de los legisladores del PPD, con el fin de evitar que les retiraran el respaldo que los han mantenido en las posiciones de liderato y de privilegio personal en el Senado.
13. No daban paso a investigaciones contra las administracio-nes pasadas del PPD.
14. No daban paso a proyectos de la delegación del PNP y presentaban proyectos sustitutivos para así adjudicarse la au-toría de los mismos.
15. No daban trato igual a los portavoces de la mayoría del PNP en comparación con los de la minoría del PPD.
16. Restaban derechos y facultades a los portavoces del PNP. Ejemplo de ell[o e]s que a diferencia de los portavoces de las minorías, los portavoces del PNP no podían solicitar la divi-sión de cuerpo para la corroboración de las votaciones.
17. No aprobaban mociones para obtener grabaciones de se-siones cuando [é]stas eran solicitadas por los Senadores del PNP, sin embargo [,] sí las aprobaban para los senadores de otros partidos.
18. Impedían que la imprenta del Senado imprimiera boleti-nes informativos para los constituyentes de los Senadores del PNP, pero daban visto bueno para otros senadores. Ejemplo de *918 esto e[s e]l discrimen contra la oficina de la Senadora Norma Burgos.
19. En la asignación de recursos y facilidades del Senado siempre se beneficiaba al grupo del actual Presidente y a los miembros de la minoría del PPD, discriminando en contra de los miembros de la delegación del PNP.
20. Ante notificaciones del Secretario de Justicia sobre alega-dos señalamientos a Senadores del PNP, los mismos eran re-feridos a la Comisión de Ética a diferencia de los miembros del grupo del Presidente McClintock o los miembros del PPD, los que protegían ordenando acciones administrativas vengativas en contra de los querellantes.
21. Notificaban tardíamente a la delegación del PNP sobre vistas oculares, reuniones ejecutivas y vistas públicas.
22. El Reglamento del Senado ha sido enmendado en cinco (5) ocasiones, a fin de afectar adversamente y obstaculizar a la delegación del PNP.
23. La composición de la Comisión de Ética ha sido trastocada para obtener control de la misma por decreto del Presidente.
24. Ha manipulado la confirmación de nominaciones que se pueden catalogar de impropias por parte del Gobernador Acevedo Vilá.
25. Se confabularon con la minoría del PPD para referir vi-ciosa y frívolamente al Presidente de la Cámara Hon. José Aponte al Departamento de Justicia y al Fiscal Especial Independiente.
26. Impedían que la delegación del PNP tuviera portavoces en las comisiones senatoriales.
27. Alteraban el orden de los autores de ciertas medidas le-gislativas para afectar a los Senadores de la delegación del PNP.
28. Trastocaban legislación de política pública ambiental de la administración del PNP. Ejemplo de ello e[s l]a Ley de la Reserva Natural y Agrícola.
29. Utilizan el foro senatorial para atacar viciosamente a lí-deres del PNP.
30. No incluyen ni nombran Senadores del PNP en comités de conferencias y comisiones especiales.
31. En clara violación al Reglamento Senatorial declaraban sin lugar o establecían nuevas reglas según les convenga a su posición. Ello proveniente de la presidencia, principalmente ante nuestros planteamientos de orden o de privilegio, todo en clara violación al Reglamento del Senado.
32. Despidieron a empleados identificados con el PNP por participar en actividades institucionales de la colectividad en su tiempo libre. Algunos ejemplos de ellos son la Sra. Glori-mary Jaime, Lie. Tony Alicea, Sra. Wanda Sánchez, Sra. Ma-yita Meléndez y el Sr. Orlando Ortiz.
*919 33. No desautorizaron a la entonces Sra. Nélida Santiag[o c]uando ésta fotografió a los manifestantes claramente identi-ficados con el PNP el día del mensaje del Gobernador Acevedo Vilá.
34. Autorizaron con fondos públicos el establecimiento de una oficina de distrito para un senador por acumulación. Este es el caso del senador por acumulación del PPD Antonio Fas Alzamora.
35. S[ó]lo permiten un asesor para to[d]a la delegación del PNP en el hemiciclo y[,] por el contrario [,] a la delegación del PPD les permiten varios asesores.
36. Fabricaron un caso de supuesta agresión al Senador De Castro Font por parte de un escolta del Senador y ex Gober-nador Pedro Rosselló.
37. Consistentemente dan prioridad a los descargues de me-didas legislativas a los componentes del grupo del Senador McClintock. Los de la delegación del PNP se detienen en la Comisión de Reglas y Calendarios.
38. El Sargento de Armas del Senado realizó un registro en pleno hemiciclo al ayudante de la portavoz Senadora Nolasco, por supuestamente éste tener un arma de fuego, lo que resultó totalmente falso.
39. Las asignaciones de donativos legislativos son despropor-ciónales y cargados para favorecer las instituciones ubicadas en los municipios de San Juan y de Bayamón, donde se ubican los Senadores Carlos Díaz y Migdalia Padilla, mientras que la Senadora Margarita Nolasco de la delegación del PNP que es Senadora por el Distrito de Guayama, distrito que es mayor en población, le asignan menos de $1 millón de dólares.
40. Se adjudican medidas del programa de gobierno inclu-yendo cambios de nombre en [su] autoría.
41. Como respuesta a una denuncia de posibles violaciones al Código de Etica y comportamiento impropio por parte del Se-nador Carlos Díaz, el Senador McClintock respondió orde-nando que se investigara un supuesto espionaje político, lo que ciertamente nunca probaron, luego de gastar miles de dó-lares en fondos públicos y desviar la atención de lo que en realidad se debió haber investigado.
42. Se unieron a la delegación del PPD para conceder inmu-nidad total a la Sra. Nélida Santiago, sin determinar la apor-tación a la investigación y de lo que podría conseguirse con otros testigos.
43. El Senador Parga reiteradamente ha planteado pública-mente que supuestamente reconstruirá el movimiento esta-dista, creando un nuevo partido estadista y abandonando el PNP.
*920 44. Limitan el acceso y la expresión a los militantes del PNP en las gradas del hemiciclo del Senado, distinto a manifesta-ciones de otras organizaciones que visitan el Capitolio.
45. Ordenan a la policía [que] desaloj[e] a los manifestantes y militantes estadistas y del PNP de las gradas del hemiciclo sin justificación alguna.
46. Con regularidad asumen posturas y votan a favor de las posiciones y solicitudes del Ejecutivo, particularmente del Go-bernador Acevedo Vilá, en contra de las determinaciones [y] acuerdo [s] del caucus del PNP.
47. Despojaron de funciones a miembros del PNP de la Comi-sión de Seguridad Pública de forma arbitraria e injustificada. Ejemplo de esto fue la remoción de la Senadora Burgos de dicha comisión.
48. En claro contubernio con el PPD permitieron y aceptaron la imposición del impuesto de ventas (Sales Tax) más alto en contra de la posición institucional del PNP, todo ello en peijuicio de nuestra ciudadanía y a un costo de cientos de millones de dóla-res anuales en contra de los pobres, los trabajadores y la clase media. El Directorio del PNP había aprobado un “Sales Tax” de un cuatro (4%) por ciento y no de siete (7%) por ciento como el impuesto por el Gobernador Acevedo Vilá con la ayuda de los legisladores del Presidente McClintock. CT-2007-07, Pieza 7, Alegato de los demandantes-recurridos, págs. 6-11.
El licenciado Rivera Schatz, en calidad de Secretario General y Comisionado Electoral del P.N.P., presentó ante el Comité una querella en contra de las Senadoras Padilla Alvelo, Arce Ferrer, así como el Senador De Castro Font. En ella se expuso lo siguiente:
En Asamblea General de Delegados celebradas los días 20 de agosto de 2006, en el Hotel [El] Conquistador en la ciudad de Fajardo y el 20 de mayo de 2007, en el Coliseíto Pedrín Zorilla en la Ciudad Capital de Puerto Rico, se ratificaron, por unani-midad, todas las sanciones impuestas a los aquí querellados. Ello bastaría para negarles aspirar bajo la insignia de nuestro glorioso partido. La traición vil y descarada de los querellados, la pública alegación de legisladores del PPD sobre los acuerdos a los que llegaban con [é]stos y el evidente comportamiento des-leal hacia el [P]artido justifican negarles el privilegio de aspirar bajo la insignia del Partido Nuevo Progresista. No obstante, existen otras razones para rechazar su aspiración. Veamos. PRIMERO: El artículo 98 del Reglamento del PNP del 2005, establece en su parte pertinente lo siguiente:
"... Toda aquella persona que desacate una decisión de la *921 Asamblea General no podrá figurar como candidato bajo la insignia del Partido, ni ocupar posiciones de liderato...” SEGUNDO: El incumplimiento del acuerdo del 15 de mayo de 2005, aprobado por la Asamblea General;
TERCERO: el incumplimiento del acuerdo del [C\aucus PNP en el [S]enado del 26 de mayo de 2005;
CUARTO: el incumplimiento de su obligación contractual con el [P]artido a los fines de acatar y respetar los acuerdos de los organismos de la colectividad;
QUINTO: la expresión, clara, robusta y convincente de el orga-nismo de mayor autoridad y representatividad de nuestro [P]artido (Asamblea General de Delegados) a los fines de que en el ejercicio de nuestro derecho constitucional declaramos que no queremos asociarnos con los querellados, en ninguna candida-tura, puesto directivo, campaña ni evento electoral. CT-2007-07, Pieza 7, Alegato de los demandantes-recurridos, págs. 11-12.
Posteriormente, el licenciado Rivera Schatz presentó una segunda querella para solicitar que se extendiera al querellado —Senador Díaz Sánchez— lo planteado en la originalmente instada por él contra los demás Senadores.
El Comité celebró vistas por separado para cada uno de los Senadores. El 9 de julio de 2007, el Comité emitió una Resolución en la que determinó que no calificaría a los Se-nadores para participar como aspirantes en la primaria interna del P.N.P. Sostuvo, entre otras cosas, lo siguiente:
Revisados los hechos, alegaciones y el expediente en los casos de los peticionarios-querellados Jorge De Castro Font, Carlos Díaz Sánchez, Migdalia Padilla Alvelo y Luz Z. Arce Ferrer, celebradas las vistas correspondientes, consideradas las quere-llas de impugnación presentadas, y escuchadas todas las par-tes, este Comité de Evaluación, por unanimidad, concluye lo siguiente:
1. La afiliación al Partido Nuevo Progresista es un requisito indispensable para que un elector cualificado pueda ser certifi-cado por este Comité como aspirante primarista. Así lo exigen el Reglamento del Partido, el Reglamento de Primarias del Par-tido y hasta la Ley Electoral de Puerto Rico:

Ley Electoral, Artículo 4.014.-Aceptación de Candidato a Primarias.-

“Todo elector aspirante a una nominación para un cargo pú-blico electivo mediante el sistema de primarias deberá figurar en el Registro de Electores Afiliados del partido que corres- *922 ponda y prestar juramento ante notario o funcionario capaci-tado para tomar juramentos, de que acepta ser postulado como candidato, de que acatará el reglamento oficial de su partido, y de que cumplirá con los requisitos constitucionales aplicables y con las disposiciones de esta ley.”
Por su parte, el Reglamento del Partido, vigente, aprobado por la Asamblea General e[l] 14 de agosto de 2005, y cuya vigencia -no controvertida- se extenderá más allá de las elec-ciones generales de noviembre de 2008, delinea específica-mente la obligación de sus miembros y afiliados:
Artículo 5: “Obligación de Defender la Declaración de Pro-pósitos y el programa de Gobierno del Partido — Todo miem-bro del Partido aceptará y defenderá la Declaración de Propó-sitos y el Programa de Gobierno del Partido. Podrá, sin embargo, presentar sus propuestas, recomendaciones o posi-ciones individuales dentro de los organismos correspondientes del Partido. No obstante, siempre deber[a] acatar y defender la Declaración de Propósitos y el Programa de Gobierno vigente. A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general, o que aspire a un cargo en el Directorio del Partido o como Pre-sidente de Comité Municipal o de Precinto, al presentar su intención como aspirante deberá presentar una declaración de fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido. La Decla-ración de Propósitos incluye la lealtad a los principios de dis-ciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones de conformidad con el Artículo 8.” (En-fasis nuestro.)
El Art. 8, en su parte pertinente, dispone:
Artículo 8- "... Todo miembro del Directorio y de la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con absoluta libertad sus opiniones o preferencias ente los organismos del Partido a los que pertenece. Pero una vez el asunto es discutido y resuelto; y habiéndose tomado una decisión democráticamente por votación mayoritaria del orga-nismo concerniente, esta se convierte en la posición institucio-nal del Partido, excepto si el organismo la reconsidera o un organismo de superior jerarquía adopta una distinta....”
2. El récord y los hechos confirman, sin lugar a dudas que, a partir de enero del año 2005, por razones de sus intereses personales, los peticionarios-querellados incurrieron en con-ductas voluntariosas, temerarias y lesivas al Partido Nuevo Progresista.
*923 3. Mientras a principios del año 2005 los senadores aquí peticionarios querellados tenían el apoyo mayoritario del Caucus PNP del Senado para mantener sus posiciones de máximo-liderato y privilegios en ese cuerpo legislativo, argumentaban públicamente que ese organismo auxiliar del Partido, creado por el Artículo 45 de nuestro Reglamento, constituía la máxima autoridad para hacer esa determinación.
4. No obstante, cuanto los peticionarios-querellados perdie-ron el apoyo mayoritario del Caucus del PNP, procedieron a menoscabar el mandato electoral y democrático de las eleccio-nes generales de 2004 que delegó la mayoría parlamentaria senatorial al Partido Nuevo Progresista, creando una alianza con senadores de otros partidos y despojando institucional-mente al PNP y a sus senadores de la mayoría legislativa que les había delegado el pueblo en las urnas.
5. Por sus propios actos, los senadores peticionarios-quere-llados quedaron desafiliados voluntariamente del Partido Nuevo Progresista al colocarse, no tan s[ó]lo al margen del Partido y su Reglamento, sino también en contraposición po-lítica, reglamentaria y programática en perjuicio del Partido y del pueblo de Puerto Rico, en violación de:
a. sus juramentos de Fidelidad Institucional juramenta-dos ante notarios y cuyo requisito para obtener una aspiración primarista también está dispuesto y protegido en el Artículo 4.014 de la Ley Electoral; y
b. en contraposición a las normas reglamentarias que de-linean la conducta de un miembro afiliado a la colectividad, incluso cuando aspira y ocupa un cargo electivo (Artículo [s] 5 y 8 del Reglamento [del] PNP).
6. Cabe señalar que ningún senador o representante es electo por el pueblo para ocupar ninguna posición de liderato dentro de las cámaras legislativas. No hay derecho propietario individual alguno para las posiciones de liderato legislativo. Ninguna disposición constitucional, estatutaria ni reglamen-taria dispone para garantizar posiciones de liderato legislativo a ningún senador o representante electo. Por el contrario, una vez son certificados los resultados electorales por la Comisión Estatal de Elecciones, se determina cu[á]l es el partido político que conforma la mayoría legislativa y cuales partidos se orga-nizarán como delegaciones minoritarias. Consumado lo anterior, son entonces los legisladores del Caucus del Partido de Mayoría los que determinan por votación qui[é]nes ocupar [á]n las distintas posiciones de liderato dentro de cada cuerpo legislativo. Esa decisión es una de carácter rigurosamente po-lítico, pues responde a las visiones de estrategias políticas y programáticas del partido político y no a las de ninguno de sus miembros en particular. Incluso, a los caucus de los partidos de minoría se les reconoce la facultad de recomendar qui[é]nes *924 de sus miembros deben ocupar determinadas posiciones den-tro del pleno o de las comisiones legislativas. Es a los partidos políticos, constituidos como caucus o delegaciones, a quienes corresponde organizar los trabajos y las posiciones de liderato legislativo. En el caso de los senadores aquí peticionarios-querellados, es evidente que el Caucus del Partido Nuevo Pro-gresista y sus organismos rectores con mayor representativi-dad determinaron, por votación y democráticamente que los intereses políticos, estratégicos, reglamentarios y programáti-cos del Partido estarían mejor servidos otorgando la presiden-cia del Senado al Presidente del Partido.
7. Con el propósito de mantener complacidos a los senado-res y a los partidos de oposición que mantienen su apoyo a sus posiciones de liderato senatorial y privilegios personales en el Senado de Puerto Rico, los peticionarios-querellados han pro-movido con sus votos la aprobación de legislación lesiva a nuestro pueblo y en contraposición del Partido Nuevo Progresista. Ejemplo evidente de lo anterior, constituye la ma-nipulación del trámite legislativo senatorial que impuso una tasa contributiva abusiva sobre las ventas y usos, en contra de la pública y ferviente oposición institucional del Partido.
8. Los antecedentes de los peticionarios-querellados le ha-cen concluir inequívocamente a este Comité que se trata de personas cuyos intereses individuales son los que determinan sus actos políticos, según las conveniencias personales de cada momento y cada circunstancia. Carecen de credibilidad, vio-lentan sus propios juramentos de fidelidad, y ahora pretenden ir contra sus propios actos para obtener el beneficio de aspirar a una candidatura utilizando el emblema, los recursos y la base electoral del Partido, solamente cuando les conviene en su carácter personal e individual.
9. Definitivamente, no estamos frente a electores afiliados al Partido Nuevo Progresista. Nuestro más alto foro judicial, el Tribunal Supremo de los Estados Unidos de América, clara y diáfanamente ha reconocido que los partidos políticos tienen el derecho y la prerrogativa de determinar quienes son miem-bros afiliados de su colectividad. Véase Democratic Party of the United States v. Wisconsin, 101 SCT 1010, 1019 (1981).
10. Este Comité concluye que los señores Jorge de Castro Font y Carlos Díaz Sánchez y las señoras Migdalia Padilla Alvelo y Luz Z. Arce Ferrer, son electores que una vez fueron afiliados a nuestro Partido, pero por sus propios actos y con-ducta contumaz, se desafiliaron voluntariamente “de facto” y “de jure”, sustantiva y cualitativamente de este Partido. No deben figurar en el Registro de Afiliados al PNP que contem-pla nuestro Reglamento y que la Ley Electoral en su Articulo 3.028, protege como una facultad “exclusiva” y “potestativa” de los partidos políticos.
*925 11. Estamos frente a electores que alegan ser estadistas y progresistas afiliados por conveniencia momentánea para ade-lantar sus aspiraciones personales de reelección frente a una nueva elección general. Electores que pretenden volver a uti-lizar el beneficio de ser elegidos bajo el emblema de un par-tido, pero que han demostrado que una vez ocupan el cargo, actúan como si hubieran sido electos como candidatos inde-pendientes, según les convenga unilateral y personalmente. Sin embargo, al momento de buscar la reelección, se niegan a utilizar el mecanismo de la “candidatura independiente” que se ajusta a sus conductas como electores porque ello les oca-siona mayores dificultades, gastos, esfuerzos y poca o ninguna posibilidad de ser elegidos.
12. Reglamentariamente, el Partido Nuevo Progresista no puede ni debe prestar su emblema para aspirantes o candida-tos que actúan a conveniencia personal y hasta en perjuicio político, reglamentario y programático de la colectividad a la que juran lealtad y fidelidad institucional. Los peticionarios-querellados, como cualquier otro elector en su misma situa-ción de conducta y antecedentes, no merecen la confianza del Partido ni ser considerados como sus afiliados. Por sus propios actos, realmente son adversarios del Partido Nuevo Progresista.
13. Los peticionarios-querellados no cumplen con los requi-sitos de idoneidad ni con los valores, compromisos, lealtades y fidelidades institucionales del Partido Nuevo Progresista.
14. Aunque los senadores peticionarios-querellados logra-ran su elección en primarias y en elecciones generales, los mis-mos no podrían ser miembros del Caucus PNP en ningún cuerpo legislativo, pues esa membresía está fundamentada en la disciplina, la confianza y en la lealtad institucional hacia el Partido, su Reglamento, su Programa de Gobierno, los acuer-dos y las directrices de sus organismos rectores. Obligar a un partido político a tener que incluir en sus cuadros de candida-tos a personas que considera non gratas, que no los considera sus afiliados y que no cumplen cabalmente con los requisitos anteriores, sería un intento de manipular el proceso político para colocar al Partido Nuevo Progresista en desventajas elec-torales frente a los demás partidos, tanto durante el proceso eleccionario como en su posterior desempeño en la función programática y gubernamental.

Recomendaciones al Directorio

Considerando plenamente los derechos electorales de los pe-ticionarios-querellados; y también los derechos electorales de los ciudadanos organizados legítima y democráticamente en el Partido Nuevo Progresista, pues ambas partes están igual-mente protegidas por nuestra Constitución estatal y federal y por nuestra Ley Electoral, determinamos lo siguiente:
*926 1. No cualificar la solicitud de los peticionarios-querellados para figurar como aspirantes en la papeleta primarista del Partido Nuevo Progresista en la Primaria Interna de 9 de marzo de 2008.
2. Dejar claramente establecido que esta descalificación está fundamentad [a] en los Artículos 4.007. — Procedimiento para Descalificación de Candidatos.-; 4.014.-Aceptación de Candidato a Primarias.-; y 3.028.-“Registro de Electores Afi-liados” de la Ley Electoral de Puerto Rico.
3. Determinar que la exclusión de los peticionarios del Re-gistro de Afiliados del PNP responde a claras y evidentes vio-laciones a los Artículos 5,8 y 45 del Reglamento del Partido.
4. A que la solicitud de aspiración primarista que presenta-ron, incluyendo la renovación de sus formularios de afiliación y sus juramentos de fidelidad al Partido con miras a la prima-ria y la elección general de 2008, son equivalentes a las mis-mas que presentaron en el 2003, pero que incumplieron y per-juraron con sus actos; convirtiéndose en personas non gratas para el Partido.
5. Que el Partido no los considera ni los puede aceptar como sus afiliados con miras a los próximos eventos eleccionarios, pues ellos mismos incurrieron en la desafiliación voluntaria y resultante de sus evidentes actuaciones voluntariosas, perju-radas y prejuiciosas en contra del Partido, sus organismos y su electorado afiliado.
6. Que en el caso de negar haberse desafiliado voluntaria-mente por sus actos, el Partido y sus organismos le reiteren que, en efecto, no los considera miembros afiliados, que no son elegibles para formar parte de ningún organismo del Partido, incluyendo los caucus y la conferencia legislativa creados por el Artículo 45 de nuestro Reglamento, ni para figurar como sus candidatos en ningún proceso electoral.
7. Tomar cualquier acción ulterior que el Directorio consi-dere pertinente.
8. Notificar a las partes afectadas. (Enfasis en el original.) CT-2007-07, Pieza 1, Apéndice, Vol. II, págs. 431-437.
Las recomendaciones del Comité fueron acogidas por el Directorio por votación mayoritaria.
El 23 de julio de 2007, el P.N.P. presentó en el Tribunal de Primera Instancia, Sala Superior de San Juan, una Pe-tición de Descalificación. Alegó, en síntesis, que los Sena-dores De Castro Font, Díaz Sánchez, así como las Senado-ras Padilla Alvelo y Arce Ferrer no cumplían con las disposiciones de la Ley Electoral y el Reglamento del P.N.P. *927 porque lo violaron al no acatar los acuerdos de la Asamblea General y el caucus de la mayoría senatorial. Se indicó, además, que los Senadores no cumplían con los requisitos de idoneidad ni con los valores, compromisos, lealtades y fidelidades institucionales del P.N.P. Se solicitó que de con-formidad con el Artículo 4.007 de la Ley Electoral, 16 L.P.R.A. see. 3157, se declarara “con lugar” la petición de descalificación en contra de los Senadores.
El 3 de agosto de 2007, los Senadores presentaron su Contestación Jurada a Querella de Descalificación. Alega-ron, entra otras cosas, que las sentencias emitidas en McClintock v. Rivera Schatz, supra, constituyen cosa juzgada en cuanto a los hechos del caso en autos. Indicaron, además, que el P.N.P. violentó la Ley Electoral al desafiliarlos por disentir en asuntos no programáticos y no reglamentarios y en violación al procedimiento dispuesto en el Reglamento de ese partido. Ese mismo día, los Senadores presentaron una Moción para Que Se Dicte Sentencia por las Alegaciones al Amparo de la Regla 10.3 de Procedimiento Civil.
El 9 de agosto de 2007, el Tribunal de Primera Instancia declaró “no ha lugar” la Moción para Que Se Dicte Senten-cia por las Alegaciones al Amparo de la Regla 10.3 de Pro-cedimiento Civil presentada por los Senadores.
El 10 de agosto de 2007, los Senadores presentaron en este foro una Solicitud de Certificación, la cual füe decla-rada no ha lugar.
Después de celebrar varios días de vista evidenciaría, el 17 de septiembre de 2007, notificada a las partes el 19 de septiembre de 2007, el Tribunal de Primera Instancia dictó una Sentencia en la que se declaró con lugar la Petición de Descalificación presentada por el P.N.P. Sostuvo, entre otras cosas, lo siguiente:
Interpretados en conjunto los artículos precitados del Regla-mento del RN.R del 2005, concluimos que entre los requisitos que debe reunir un elector afiliado para poder participar en las primarias del 2008 están: (1) disciplina, lealtad, compro-miso y respeto hacia los reglamentos, resoluciones, acuerdos y compromisos programáticos adoptados por votación mayorita- *928 ria; (2) aceptar y defender la Declaración de Propósitos del Reglamento y el Programa de Gobierno del P.N.P.; y (3) acatar las decisiones de la Asamblea General.
Consideradas las disposiciones reglamentarias aquí transcri-tas y la evidencia presentada en la vista en su fondo, resolve-mos que la decisión del Directorio del P.N.P. en relación con la determinación de violación a las disposiciones reglamentarias del partido por falta de disciplina, lealtad y compromiso hacia la Declaración de Propósitos del Reglamento del 2005 y hacia la decisión de la Asamblea General no es una arbitraria, ni caprichosa. Por tanto, este tribunal no habrá de intervenir con la determinación de no calificación del P.N.P. basada en la in-terpretación de un reglamento interno para no violentar la See. 6, Art. II de la Constitución de Puerto Rico que reconoce como un derecho fundamental el derecho de asociación. La libertad de asociación incluye y protege la prerrogativa de los partidos políticos de seleccionar los candidatos que habrán de representarles y que divulgarán su plataforma, mensaje, ideo-logía y programa.
En cuanto al planteamiento de los codemandados consis-tente en que el Comité no les garantizó un debido procedi-miento de ley, surge de la evidencia lo contrario. Los cuatro codemandados fueron notificados con copia de las dos quere-llas; presentaron oposición por escrito a las querellas con evi-dencia documental; se celebró una vista; tuvieron representa-ción legal; tuvieron la oportunidad para presentar evidencia y refutar las alegaciones de las querellas y la evidencia que se acompañó con las mismas; no se cuestionó la imparcialidad de la mayoría de los miembros del Comité; no hay evidencia de que la decisión del Directorio no está basada exclusivamente en el récord; no se cuestionó la imparcialidad de los miembros del Directorio, organismo que emitió la decisión de descalifica-ción; y tienen derecho a solicitar reconsideración y apelar.
Plantearon los 4 codemandados que el mandato de la Asam-blea General del PNP del 15 de mayo de 2006 que ordena a los legisladores del PNP elegir al Dr. Pedro Rosselló como Presi-dente del Senado no tiene que ser acatada por ser contraria a la ley, en particular a la Carta de Derechos del Elector, supra. No les asiste la razón.
En ambas cámaras de la Asamblea Legislativa de Puerto Rico existen dos realidades políticas: la pública o de jure y la político partidista. Son dos realidades las que aunque separa-das, coexisten y se entrelazan. El Art. 21 del Código Político, 2 L.P.R.A. sec. 2[,] establece que los miembros del Senado, sin hacer referencia a la mayoría parlamentaria, elegirá en la pri-mera sesión los oficiales del Senado. Como antes vimos [,] la *929 realidad es otra. Véase Reglamento del P.N.R del 2005, Art. 45.
¿Es ilegal el mandato de la Asamblea General por no estar vacante la presidencia del Senado? La contestación, no.
Se trata de una decisión tomada por un organismo rector del P.N.P. dirigida a sus electores afiliados y no a los senadores. No hay ley en esta jurisdicción que prohíba a un partido polí-tico impartir instrucciones a los electores afiliados que ocupen cargos públicos sobre las acciones a tomar para cumplir sus planes, acuerdos, compromisos y programas. Los partidos po-líticos no dejan de existir una vez pasada las elecciones. Des-pués de una elección general estos organismos dan cohesión a la labor de los funcionarios electos para alcanzar sus compro-misos programáticos.
También debemos resolver si está impedido el P.N.P. por la Carta de Derechos del Elector contenida en la Ley Electoral, Art. 2.001 en específico en su inciso (6), supra, de no calificar los codemandados por éstos tener derecho a disentir sobre asuntos que no sean programáticos o reglamentarios.
Habiendo este Tribunal establecido que nointervendrá con la conclusión del P.N.P. consistente en que los 4 codemandados no deben ser calificados por no cumplir con los requisitos re-glamentarios de disciplina, lealtad, compromiso y fidelidad hacia el partido, determinamos que la parte demandante sa-tisfizo el requerimiento de la Carta de Derechos del Elector, Art. 2.001(6), supra, al tomar su decisión de no calificar a los 4 codemandados, quienes alegan ser disidentes, por no cumplir con los requisitos reglamentarios para aspirar a cargos públi-cos bajo su insignia.
Señalan los codemandados que no pueden ser sancionados por disentir a tenor con lo establecido en la Carta de Derechos del Elector contenido en el Art. 2.001, inciso 6, supra.
Sobre el derecho de los codemandados a disentir, el Comité expresó en su resolución, a la página 12, lo siguiente:

El “elector afiliado” tiene derecho a disentir, pero no a in-cumplir sus juramentos de fidelidad ni a imponerse capri-chosa, desafiante y temerariamente, una vez los organismos rectores del partido ventilan un asunto y adoptan una posición institucional por votación mayoritaria. De hecho, esa es la nor-mativa reglamentaria del Partido Nuevo Progresista.

Dar una interpretación absoluta al término “disentir” como equivalente a “imponerse”, “desafiar”y hasta “incumplir”jura-mentos de fidelidad institucional sería contradictorio al reco-nocimiento que la misma Ley Electoral (Artículo 4.014) hace sobre la validez y la existencia de los reglamentos de los parti-dos políticos y los juramentos de fidelidad institucional que sus afiliados y candidatos deben hacer al colectivo.

Identificado un grado de tensión de entre los intereses del *930 partido en mantener disciplina, compromiso y fidelidad hacia su declaración de propósitos y el de los codemandados a disen-tir en relación con el mandato de la Asamblea General del 15 de mayo de 2005, el tribunal está llamado a considerar el valor principal tutelado por la Ley Electoral de proteger el derecho del ciudadano a expresarse mediante el voto. Véase Kenneth McClintock Hernández et als. v. Thomas Rivera Schatz et als, supra, pág. 20.
Si bien los 4 codemandados son electores afiliados al P.N.P., así mismo fueron electos a cargos públicos bajo la insignia de ese partido político y lo representan ante el pueblo.
Al suscribir los 4 codemandados la declaración de fidelidad al P.N.P. se obligaron a respetar su declaración de propósitos, reglamento y las decisiones de sus cuerpos rectores.
El derecho de los 4 codemandados a disentir con respecto [al] interés del P.N.P. a elegir al doctor Pedro Rosselló como Presidente del Senado, una vez es discutido internamente y tomada una decisión por la Asamblea General, el organismo rector de mayor jerarquía, la cuestión original se transforma en un interés en mantener la disciplina y la unidad institucional. Por ello, concluimos que el interés de los 4 code-mandados a disentir no puede tener un rango de mayor jerar-quía que el del P.N.P. en mantener su integridad, disciplina y unidad, porque de lo contrario se plantaría por el tribunal una semilla de discordia en el seno del partido. El Art. 2.001(6) de la Ley Electoral, supra, reconoce que los electores tienen de-recho a disentir sobre cuestiones no reglamentarias. Eso no quiere decir que como el Reglamento del P.N.P. de 2005 no establece que el doctor Pedro Rosselló debe ser elegido como Presidente del Senado, los 4 codemandados tienen derecho a disentir sobre esa cuestión por no ser una reglamentaria. Esa posición es una simplista. Entendemos que entre las cuestio-nes reglamentarias a las que se refiere el Art. 2.001(6), supra, es al mandato de sus organismos rectores. [É]sta[,] a nuestro entender],] es la interpretación que hace un balance adecuado entre los intereses de los electores y los del partido político. Una interpretación contraria, violentaría el derecho fundamental de los partidos a la libertad de asociación.
Por todo lo ante[s] expuesto, el tribunal declara la demanda con lugar. Se le ordena a la Comisión Estatal de Elecciones acatar la decisión del P.N.P. de no calificar a Jorge de Castro Font, Luz Z. Arce Ferrer, Carlos Díaz Sánchez y Migdalia Padilla Alvelo.
Inconformes, el 1 de octubre de 2007 los Senadores pre-sentaron un recurso de apelación ante el Tribunal de Ape- *931 ¡aciones, Region Judicial de San Juan, donde señalaron que el Tribunal de Primera Instancia había cometido los errores siguientes:

A. Erró el Tribunal de Primera Instancia al resolver que los partidos políticos tienen la facultad de decidir asuntos que la Constitución reservó para los miembros de los cuerpos legislativos.

B. Erró el Tribunal de Primera Instancia al insinuar que la Ley Electoral tiene visos de inconstitucionalidad.

C. Erró el Tribunal de Primera Instancia al resolver que el PNP le brindó el debido proceso de ley a los senadores recurrentes.

D. Erró el Tribunal de Primera Instancia al no aplicar al caso de autos a tenor con la doctrina de cosa juzgada.

E. Erró el Tribunal de Primera Instancia al no desestimar la demanda que incoó el PNP por

1. No presentar prueba el PNP suficiente en derecho para descalificar a los senadores recurrentes.

2. Al ignorar que toda actuación de los senadores recu-rrentes están protegid[a]s por la inmunidad parlamentaria.

F. Erró el Tribunal de Primera Instancia al incumplir con las funciones que le asigna la Ley Electoral de adjudicar por sí misma la descalificación de aspirantes a puestos sujetos a elección. (Énfasis en el original.) CT-2007-07, Pieza 3, Apela-ción civil, págs. 2006-2007.
El 7 de octubre de 2007, los Senadores presentaron ante nos un recurso de certificación, el cual fue expedido el 8 de octubre de 2007.
II
A. Cosa juzgada
Los Senadores levantaron la defensa de cosa juzgada y alegan que existe identidad de causa, ya que ambos casos versan sobre si el P.N.P. puede prohibirles participar en las primarias de ese partido, por no acatar el mandato de ele-gir al Senador Rosselló González Presidente del Senado. No les asiste la razón. Veamos.
*932 La doctrina de cosa juzgada tiene base estatutaria en el Artículo 1204 del Código Civil de Puerto Rico,(2) el cual dispone lo siguiente:
Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquél en que ésta sea invocada, concurra la más perfecta iden-tidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron. (Enfasis suplido.)
La jurisprudencia interpretativa del Artículo 1204 del Código Civil de Puerto Rico, supra, ha expresado que tanto la doctrina de cosa juzgada como su modalidad de impedi-mento colateral tienen como propósito proteger a los liti-gantes contra lo que representa defenderse o probar sus reclamaciones en repetidas ocasiones tratándose de la misma controversia. En esencia, busca promover la econo-mía judicial y administrativa al evitar litigios innecesarios y evitar decisiones inconsistentes.(3)
Según expresa el profesor José María Manresa y Navarro en su obra Comentarios al Código Civil español, el referido artículo se limita a brindar las reglas para que la resolución de un caso, a través de un juicio, enerve la ac-ción entablada en otro, por la santidad que merece la cosa juzgada y el respeto de toda sentencia ejecutoria. Sin embargo, añade que no regula los efectos jurídicos que el debate en un pleito y resolución que lo termine hayan de producir en otro asunto igual o idéntico en que no se haya estimado aquella excepción, dadas las circunstancias de cada caso y relaciones jurídicas que puedan mediar entre los contendientes, y la causa u origen de las reclamaciones posteriores.(4) Así también, expresa que no cabe referir la cosa juzgada a resoluciones que por cualquier motivo no *933 juzgaron, esto es, no decidieron nada sobre el punto contro-vertido en el pleito en que se invoca la excepción.(5)
Para que sea efectiva la presunción de cosa juzgada en un pleito ulterior, resulta indispensable que exista la más perfecta identidad, tanto en el plano objetivo, de las cosas y las causas, como en el plano subjetivo, de las personas liti-gantes y la calidad en que lo fueron en el caso resuelto por la sentencia y aquel en que dicha defensa afirmativa se invoque.(6) La más “perfecta identidad” entre los elementos subjetivos y objetivos de las sentencias en relación exige un juicio comparativo entre la sentencia anterior y las pre-tensiones del proceso posterior para determinar si concu-rren o no las identidades por razón de las personas litigan-tes, del objeto litigioso, y de la causa de pedir.
La cosa responde básicamente al objeto o materia sobre la cual se ejercita la acción. En este sentido hemos expre-sado que un criterio certero para determinar la identidad del objeto es si un juez está expuesto a contradecir una decisión anterior afirmando un derecho nacido o naciente, entonces podemos afirmar que existe identidad de objeto y cosa juzgada.(7)
En este sentido, el profesor Manresa señala que, cuando se trata de identidad de cosas, el género y la identidad de título y de obligación en que se basa el litigio será la regla atendible. De este modo, “negado el derecho a una cosa principal debe entenderse resuelto lo relativo a las cosas accesorias o subordinadas, pero no viceversa”. Y añade, “cuando se declaran derechos (verbigracia, usufructo, pose-sión, uso, etc.) puede una misma cosa ser objeto de diferen-tes litigios, salvo el caso de fundarse todos esos derechos en *934 una misma causa ya resuelta, verbigracia o un mismo con-trato declarado nulo”.
Por lo tanto, se debe observar, rigurosamente, que am-bos litigios traten sobre idéntico objeto para que se dé la cosa juzgada, pues, aun cuando correspondan al mismo asunto, pueden concurrir circunstancias o estados que in-duzcan a distinta conclusión en el orden jurídico.(8)
En lo referente a la causa, dicho término posee un sen-tido que no es de razón o motivo de un contrato o acto jurídico, significando el fundamento capital, el origen de las acciones o excepciones planteadas y resueltas.(9) En otras palabras, la causa equivale al fundamento o razón de pedir. La identidad de causas existe cuando los hechos y fundamentos de las peticiones son idénticos en lo que afecta a la cuestión planteada.(10)
Igual criterio se puede aplicar en cuanto a la identidad y calidad de personas. Se considera cumplida en la prác-tica cuando los litigantes o las personas del segundo pleito ejercitan la misma acción que se ejercitó en el primero, invocan fundamentos iguales y apoyan su pretensión en los mismos títulos. Es decir, que una misma sea la relación jurídica que fue materia de resolución en ambos litigios, aunque sean físicamente distintas las personas que en ellos intervinieron.(11)
En este proceso evaluativo cabe puntualizar que, es la parte dispositiva de las sentencia la que puede producir cosa juzgada, no así los fundamentos.(12) Además, se pre-cisa que la sentencia primera en que la excepción de cosa juzgada se apoye, haya resuelto sobre el fondo del asunto.(13) En Millón v. Caribe Motors Corp.,(14) señalamos *935 que la mejor prueba para determinar si una sentencia anterior es un impedimento para una acción subsiguiente es inquirir si la misma evidencia es suficiente para sostener ambas acciones. Por el contrario, si para sostener las accio-nes se necesita evidencia distinta, entonces se trata de causas de acción diferentes y la primera sentencia no es impedimento para litigar la otra causa de acción.(15)
Siendo de aplicación la doctrina de cosa juzgada, la sen-tencia dictada en un pleito anterior impide que se litigue en un pleito posterior, entre las mismas partes y sobre la misma causa de acción y cosas, las cuestiones ya litigadas y adjudicadas. Impide, además, litigar aquellas cuestiones que pudieron haber sido litigadas y adjudicadas con pro-piedad en la acción anterior y no se plantearon.
No obstante, conviene puntualizar que la aludida doc-trina no debe ser aplicada de forma rígida ni auto-mática.(16) En Pérez v. Bauzá,(17) y en Millán v. Caribe Motors Corp., supra, expresamos que un tribunal no debe aplicar la doctrina de cosa juzgada en forma inflexible, si al así hacerlo se derrotan los fines de la justicia, especial-mente si se plantean consideraciones de interés público. De este modo dejamos claro que la doctrina de res judicata no es absoluta y siempre se debe considerar conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso. A esos efectos hemos resuelto lo siguiente:
Según se ha expresado, la doctrina descansa en el principio básico de que debe propiciarse la terminación de litigios, pero si la aplicación rigurosa de la misma derrotaría en la prá etica un derecho permeado en alguna forma del interés pú blico, los tribunales se inclinan hacia la solución que garantice cum-plida justicia, en lugar de favorecer en forma rígida una fic-ción de ley que obedece fundamentalmente a un principio de *936 conveniencia y orden procesal. (Énfasis suplido.) Pérez v. Bauzá, supra, pág. 226.(18)
Hemos reconocido, además, como excepciones a la doc-trina de cosa juzgada, las siguientes: una sentencia previa que es nula o que fue dictada basándose en un allana-miento de partes que es nulo;(19) una sentencia previa dic-tada sin jurisdicción; una sentencia del Tribunal de Pri-mera Instancia cuya revisión se intentó pero que no se pudo lograr por razones ajenas a la voluntad del apelante, fraude o aquella que derrota los fines de la justicia, y los casos que están permeados de consideraciones de orden público.(20) La doctrina de cosa juzgada no debe aplicarse inflexiblemente, especialmente cuando al hacerlo se des-virtúan los fines de la justicia, produce resultados absur-dos o cuando se plantean consideraciones de interés público. (21)
Concluimos que no existe identidad de causa entre el presente caso y McClintock v. Rivera Schatz, supra. El caso McClintock v. Rivera Schatz, supra, versaba sobre las san-ciones impuestas a los Senadores por no acatar el mandato de la Asamblea General del P.N.P, mucho antes que se abriera el proceso de presentación de intención de candida-turas al Senado de Puerto Rico para la primaria a cele-brarse el 9 marzo de 2008. A esos efectos el Tribunal de Primera Instancia aclaró, en ese caso, que los tribunales en ningún momento resolvieron que los aquí peticionarios tuvieran el derecho absoluto de participar en las primarias del P.N.P. sin antes cumplir, como todo aspirante a prima-rias, con los procedimientos dispuestos en la Ley Electoral, que incluye el proceso de descalificación de candidatos. El *937 foro primario se pronunció expresamente que ese caso dilucidó el tema de la destitución y de las sanciones impues-tas a los electores afiliados de un partido político. Puntua-lizó ese foro que en el ejercicio de esos derechos concedidos y reconocidos individualmente a los aquí peticionarios como afiliados al P.N.P, procedía que éstos se sometieran al proceso de calificación que establece ese partido político bajo la Ley Electoral. El caso en autos versa sobre la deci-sión del Comité de Evaluación de no cualificar la intención de los Senadores para participar como aspirantes a candi-daturas al Senado en las primarias del P.N.P. por no cum-plir con los requisitos correspondientes.
La doctrina de cosa juzgada impide litigar aquellas cuestiones que pudieron haber sido litigadas y adjudicadas con propiedad en la acción anterior y no se plantearon. En el pleito anterior era imposible dilucidar si los Senadores cumplían con los requisitos estatutarios y reglamentarios para poder figurar como aspirantes en la papeleta prima-rista del P.N.P., ya que el periodo para presentar las can-didaturas se abrió el 1ro junio de 2007. Era imposible dilucidar tal asunto antes de dicha fecha, y de lo actuado por el Comité de Evaluación del P.N.P. Esto claramente distin-gue un caso del otro, derrotando la teoría de identidad de causa. La causa de acción del primer pleito trataba sobre las sanciones impuestas por los cuerpos rectores del P.N.P, mientras que la causa de acción en este pleito sobre peti-ción de descalificación gira sobre la decisión del Comité de Evaluación del P.N.P. de no cualificar a los Senadores por éstos no cumplir con los requisitos estatutarios y regla-mentarios para presentar su intención de aspirar a un es-caño al Senado de Puerto Rico bajo la insignia del P.N.P.
Existen varias excepciones a la aplicación de la doctrina de cosa juzgada. Entre éstas se encuentran aquellos casos que están permeados de consideraciones de orden público.(22) Dicha doctrina descansa en el principio básico *938 de que se debe propiciar que se terminen los litigios. No obstante, si la aplicación rigurosa de la doctrina derrota un derecho permeado de interés público, los tribunales deben inclinarse hacia la solución que garantice cumplida justi-cia, en lugar de favorecer en forma rígida una ficción de ley que obedece a un principio de conveniencia y orden procesal. La doctrina de cosa juzgada no es absoluta y debe considerarse junto al principio de que se debe dispensar justicia en cada caso. La misma no se debe aplicar cuando existe el potencial de desvirtuar los fines de la justicia, producir resultados absurdos o cuando se plantean consi-deraciones de interés público.(23)
El interés público de este caso está representado por el orden público constituido por el conjunto de principios, va-lores y normas de sabio gobierno democrático, que es parte del estilo de vida del pueblo de Puerto Rico y que actúa como instrumento jurídico progresivo de nuestro ordena-miento jurídico constitucional y estatutario. Realmente, el interés público dimanante de esos valores nos impone el deber de garantizar el derecho a la libertad de asociación como instrumento de nuestra democracia constitucional. La libertad de asociarse para la promoción y el progreso común de principios e ideologías políticas, necesariamente presupone la libertad de identificar las personas que cons-tituyen esa asociación en la forma de un partido político. Presupone, además, la autoridad como elemento inseparable de esa libertad para limitar la condición de elector afi-liado de dicha organización y regular los requisitos para participar en una primaria interna, para representar la promoción y el progreso de esos principios e ideologías políticas. De otra forma el mandato electoral a ser emitido por nuestro pueblo en los próximos comicios electorales a celebrarse en noviembre de 2008 podría ser frustrado. Si la ciudadanía escoge mayoritariamente esos principios e ideales en los próximos comicios generales, éstos sólo se *939 traducen en la acción que el pueblo entiende como de su beneficio a través de los funcionarios electos bajo la insignia de ese partido político. De no escogerse mayoritaria-mente esos principios e ideales, los funcionarios electos como minoría parlamentaria que los representan tienen una función importantísima —de rango constitucional— en nuestro sistema democrático que igualmente podría ser frustrada. Cualquier otra consideración cede ante la pro-minencia e importancia de este interés público dentro de nuestro sistema democrático de gobierno.
B. Debido proceso de ley
Los Senadores alegan que el P.N.P. les violentó su dere-cho a un debido proceso de ley, ya que todo el procedi-miento interno estaba amañado para producir un solo re-sultado: la descalificación de sus candidaturas. Alegan, además, que dicha colectividad política solamente creó una apariencia de que se cumplió con el debido proceso de ley. No les asiste la razón. Veamos.
El Art. II, Sec. 7 de la Constitución de Puerto Rico dis-pone lo siguiente:
Ninguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.(24)
El debido proceso de ley se puede manifestar de forma sustantiva y procesal.(25) Bajo la manifestación sustantiva, los tribunales deben examinar la validez de una ley, según los preceptos constitucionales pertinentes, con el propósito de proteger los derechos fundamentales de las personas. El Estado no puede afectar de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad de una persona.
El debido proceso de ley, en su modalidad procesal, le impone al Estado la obligación de garantizar que la inter- *940 ferencia con los intereses de libertad y propiedad del indi-viduo se haga a través de un procedimiento que sea justo y equitativo.(26) Dependiendo de las circunstancias específi-cas del caso, diversas situaciones pueden requerir diferen-tes tipos de procedimiento, siempre persistiendo el requi-sito general de que sea un proceso justo e imparcial.(27)
Después que se determina cuál de las dos modalidades de debido proceso de ley aplica, se tiene entonces que de-terminar cuál es el procedimiento exigido.(28)
El debido proceso de ley no tiene un contenido fijo inde-pendiente de la situación particular. En lo que concierne a lo procesal, no es un molde riguroso que se da en el abs-tracto, pues su naturaleza es eminentemente circunstan-cial y pragmática, no dogmática. En Gilbert v. Homar, 520 U.S. 924, 930 (1997), citando a Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895 (1961), y a Morrissey v. Brewer, 408 U.S. 471, 481 (1972), el Tribunal Supremo de Estados Unidos expresó lo siguiente:
It is by now well established “ ‘that due process,’ -unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.” ... “[D]ue process is flexible and calls for such procedural protections as the particular situation demands.”
El debido proceso de ley requiere que solamente se haga “some kind of hearing” antes que se le prive cualquier de-recho propietario significante a una personal.(29) Aunque es idóneo que se ofrezca la vista antes de privar un derecho propietario, en ciertas y determinadas situaciones, es sufi-ciente con celebrar la vista después.(30)
El 19 de jimio de 2007, el licenciado Díaz Urbina, la Representante Ramos Rivera y el Senador Pagán González *941 presentaron una querella ante el Comité contra la Sena-dora Padilla Alvelo y el Senador De Castro Font. Dicha querella contenía cuarenta y ocho señalamientos específi-cos de comportamientos y actuaciones de los Senadores. Dicha querella fue notificada con copia a los querellados. El licenciado Rivera Schatz también presentó ante el Co-mité una querella en contra de las Senadoras Padilla Al-velo, Arce Ferrer, así como en contra del Senador De Castro Font. Posteriormente, el licenciado Rivera Schatz presentó una segunda querella en la que solicitó que se extendiera al Senador Díaz Sánchez lo planteado en la ins-tada originalmente por él contra los demás Senadores. Dichas querellas fueron notificadas con copia a los querellados.
El 25 de junio de 2007, las Senadoras Padilla Alvelo y Arce Ferrer, así como el Senador De Castro Font, presen-taron Contestación a Querella en el Comité. Solicitaron, entre otras cosas, que se desestimara la querella presen-tada por el licenciado Rivera Schatz.
En esa misma fecha, las Senadoras Padilla Alvelo y Arce Ferrer, así como los Senadores De Castro Font y Díaz Sán-chez presentaron Contestación a Querella/Impugnación de Petición de Candidaturas y otros Extremos en el Comité. Contestaron los cuarenta y ocho señalamientos que se les hicieron en la querella presentada el 19 de junio de 2007. Solicitaron, además, que se desestimara dicha querella y se les certificara como precandidatos a los puestos que solicitaban.
El 5 de julio de 2007, el Senador Díaz Sánchez presentó Contestación a Querella en el Comité. Solicitó, entre otras cosas, que se desestimara la querella presentada por el licenciado Rivera Schatz.
Cada uno de los Senadores asistió a una vista ante el Comité, donde pudieron confrontar y argumentar las ale-gaciones en su contra, contrainterrogar testigos y defenderse.
*942 El 9 de julio de 2007, el Comité emitió una extensa Re-solución por unanimidad mediante la que determinaron no cualificar a los Senadores para participar como aspirantes en la primaria interna del RN.R Se les apercibió, además, que de no estar conformes con la determinación, tenían un término de diez días para solicitarle al Comité una reconsideración.
De lo hechos anteriormente narrados, concluimos que no se violentó el debido proceso de ley de los Senadores. Primero, todos los Senadores fueron notificados por escrito de las querellas presentadas en su contra. Segundo, los Senadores contestaron por escrito todas las querellas pre-sentadas en su contra. Anejaron a su contestación eviden-cia documental. Tercero, el Comité celebró una vista en donde se les brindó a los Senadores la oportunidad de pre-sentar y refutar prueba y de estar asistidos por un abogado. Cuarto, los Senadores acudieron y participaron de estas vistas. Tuvieron la oportunidad de presentar evi-dencia adicional y de refutar las alegaciones de las quere-llas presentadas en su contra y la evidencia documental que se acompañó con las mismas. Quinto, no se cuestionó la imparcialidad de los miembros del Comité. Sexto, el Co-mité les notificó por escrito de su decisión y les apercibió de su derecho de solicitar reconsideración. Séptimo, los Sena-dores no demostraron que la decisión del Directorio del P.N.P. no estuviera basada exclusivamente en el expediente. Octavo, no se cuestionó la imparcialidad de los miembros del Directorio, organismo que emitió la decisión de descalificación.
Entre los asuntos que todo proceso adversativo debe ga-rantizar para satisfacer las exigencias del debido proceso se encuentran, precisamente, la oportunidad de ser oído, el derecho a contrainterrogar testigos y el derecho a exami-nar la evidencia presentada por la parte contraria.(31) Se-gún lo antes expuesto, no hay duda que el Comité cum- *943 plió con cada uno de los requisitos del debido proceso de ley.
Todos los Senadores, aquí peticionarios, participaron ac-tivamente en el proceso que se condujo ante el Comité. No es hasta que el Comité emite su resolución, que los Sena-dores cuestionaron su imparcialidad. Tampoco demostra-ron que la decisión del Comité no estuviera sostenida ex-clusivamente en el récord.
Según este cuadro fáctico y procesal concluimos que el Comité no privó a los Senadores de su derecho a un debido proceso de acuerdo con la citada See. 7 del Art. II de la Constitución de Puerto Rico.
C. Intervención judicial en los asuntos internos de los par-tidos políticos
Los Senadores, aquí peticionarios, alegan, entre otras cosas, que el Tribunal de Primera Instancia antepuso el derecho de libertad de asociación del P.N.P. a los derechos y las prerrogativas que la Carta de Derechos del Elector les garantiza. Indicaron, además, que el que un organismo de un partido político pueda determinar la descalificación de un aspirante a primaria, no necesariamente implica que cumplió con su obligación de imparcialidad e independen-cia de criterio, que es necesario para proteger el derecho al voto de los ciudadanos. Como resultado de esto, entienden que erró el Tribunal de Primera Instancia al limitarse a examinar si la determinación del organismo calificador del partido no fue arbitraria y caprichosa. Argüyeron que ello equivaldría a cambiar la intención legislativa y poner en manos de los partidos políticos lo que siempre se interesó estuviera fuera de su control. Sostuvieron, además, que intervenir con la decisión de no calificar a los Senadores no causa daño alguno al P.N.P. ya que no afectan las estruc-turas internas del partido ni su composición interna actual. No les asiste la razón. Veamos.
*944 Como regla general, los tribunales rara vez intervienen en los asuntos internos de los partidos políticos. De así hacerlo, se debe hacer con mucha delicadeza y cuidado.(32)
En Cullen v. Auclair, 714 A.2d 1187, 1189 (1998), el Tribunal Supremo del Estado de Rhode Island sostuvo lo si-guiente:
A more common explanation for judicial restraint in entering the “political thicket” is the belief that a large public interest is served in allowing the political processes to function free from judicial supervision. ...Therefore, political partiesare generally recognized to have certain “inherent powers of self-government” and to be vested with wide discretion to interpret and decide their own regulations, rules and disputes .... Accordingly, in determining whether a particular dispute is a non-justiciable political matter, the focus has been on whether the dispute is an “integral part of the electoral process” or merely involves the internal affairs of the political party. (Enfasis su-plido y citas omitidas.)
La Rama Judicial no tiene jurisdicción para intervenir en controversias que son exclusivamente asuntos internos de un partido político.(33) Controversias internas de los par-tidos políticos deben ser resueltas por los organismos inter-nos de la colectividad política.(34) La expulsión de miem-bros de una asociación voluntaria es, de ordinario, una cuestión de disciplina interna con la cual los tribunales no deben intervenir.(35)
En Democratic Party of The United States v. Wisconsin, 450 U.S. 107, 121-122 (1981), el Tribunal Supremo de Es-tados Unidos expresó lo siguiente:
This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the *945 Fourteenth Amendment from infringement by any State. And the freedom to associate for the “common advancement of political beliefs,” necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only. ...
On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions-thus impairing the party’s essential functions-and that political parties may accordingly protect themselves “from intrusion by those with adverse political principles.” (Enfasis suplido y citas omitidas.)
En Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957), el Tribunal Supremo de Estados Unidos expresó lo si-guiente:
Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. (En-fasis suplido.)
En Democratic Party of The United States v. Wisconsin, supra, el Tribunal Supremo de Estados Unidos, citando al tratadista constitucional Laurence H. Tribe,(36) añadió lo siguiente:
Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association’s being. (Enfasis suplido.)
La libertad de asociarse para adelantar ideas políticas comunes, presupone necesariamente la libertad de identi-ficar las personas que constituyen esa asociación y limi-tarla a esas personas solamente.(37)
En Alabama Republican Party v. McGinley, 893 So.2d 337, 346-349 (2004), el Tribunal Supremo del Estado de Alabama expresó lo siguiente:

*946
The ultimate question is: who is the final arbiter of whether a potential candidate truly is, in the words of the Party’s qualifying form, “in accord with, and endorsefs], the principles and policies of the Republican Party”? For good or for ill, the answer must be the Party itself, not the courts and not every individual who desires to run for election as a Republican.

However, it should be obvious that involvement in this issue-what is a political party’s actual platform and who decides what it is-is something that courts must avoid. ...The inherently subjective judgment of the candidate committee as to the sincerity of a candidate’s pledge, based on the facts in this record, falls well within the constitutionally permissible limits of the authority of a political party asserting its right to determine who may be associated with the party. No court should second-guess such a determination. (Enfasis suplido.)
El derecho de los ciudadanos a asociarse libremente con otras personas y a organizarse en grupos en la figura de partidos políticos, y presentar candidatos de su predilec-ción para participar en el proceso electoral, tiene su origen en el fundamental derecho al sufragio, que es consustan-cial con la existencia misma de nuestra democracia constitucional.(38) Los partidos políticos son asociaciones de personas que creen en ciertos principios de gobierno, con el propósito de promover sus ideas políticas mediante la no-minación de candidatos a puestos públicos; de controlar las estructuras gubernamentales con el propósito de formular y poner en vigor la política pública, según sus ideas y principios.(39) Una de sus funciones básicas es escoger los candidatos comprometidos con esas ideas y principios que van a representar a los ciudadanos que las avalan con su voto.(40)
En Barceló v. Saldaña, Secretario Ejecutivo, 42 D.P.R. 226, 254 (1931), citando a. Davis v. Hambrick, 58 S.W. 779, 780 (1900), expresamos lo siguiente:
“Los partidos políticos son asociaciones voluntarias para fi *947 nes políticos. Son regidos por sus propios usos y establecen sus propias reglas. Los miembros de tales partidos pueden consti-tuirlos, reorganizarlos, y disolverlos a su voluntad. Los electo-res que constituyen tal partido son, en verdad, el único cuerpo que puede finalmente determinar entre facciones u organiza-ciones rivales.” (Enfasis suplido.)
En Barceló v. Saldaña, Secretario Ejecutivo, supra, pág. 254, citando a Morrow v. Wipf, 115 N.W. 1121, 1126 y 1127, expresamos lo siguiente:

“Los partidos políticos no son creaciones de la ley. Existen independientemente de los estatutos; y tienen poder inherente para reglamentar sus propios asuntos, sujetos solamente a aquellas restricciones legislativas que han sido legalmente enastadas.

Los partidos políticos resultan de la asociación voluntaria de los electores. No existen por ministerio de ley; y poseen plenos poderes respecto a sus propios asuntos, en ausencia de regla-mentación legislativa.” (Enfasis suplido.)
En Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 214 (1986), el Tribunal Supremo de Estados Unidos expresó lo siguiente:

The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization .. .As we have said, the freedom to join together in furtherance of common political beliefs “necessarily presupposes the freedom to identify the people who constitute the association.” ...

Considered from the standpoint of the Party itself, the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important. (Enfasis su-plido y citas omitidas.)
En EU. v. San Francisco Democratic Comm., el Tribunal Supremo de Estados Unidos expresó lo siguiente:

Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association. It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments .... Free
*948
dom of association means not only that an individual voter has the right to associate with the political party of her choice ... but also that a political party has a right to ... “ ‘identify the people who constitute the association,’”... and to select a standard bearer who best represents the party’s ideologies and preferences.”

[A] political party s “determination ...of the structure which best allows it to pursue its political goals, is protected by the Constitution.” ... Freedom of association also encompasses a political partys decisions about the identity of, and the process for electing, its leaders. (Enfasis suplido y citas omitidas.)(41)
En Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984), el Tribunal Supremo de Estados Unidos expres lo siguiente:
There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate. (Enfásis suplido.)
En Belluso v. Poythress, 485 F. Supp. 904, 912 (D. Ga. 1860), el Tribunal de Distrito federal para el Distrito Norte del Estado de Georgia expresó lo siguiente:
His claimed need to associate with an unwilling partner, the Republican party in Georgia, is not a first amendment right. Indeed, to the degree that rights of association are implicated, we think these rights militate in favor of leaving a party free to limit access to its own primary ballot. (Enfasis suplido.)
La constitución y el reglamento interno de una asocia-ción privada son un contrato entre los miembros o entre la asociación y sus miembros.(42) Los partidos políticos son libres para adoptar sus propios procedimientos internos, *949 limitados exclusivamente por las nociones de las garantías a la igual protección de la ley y el debido proceso de ley.(43)
Sobre este tema, en el artículo Primary Elections and the Collective Right of Freedom of Association (44) de la re-vista jurídica de la Universidad de Yale se expresó lo si-guiente:
B. Participation in a Primary Election

The right of political association must include the power of a political party to seek a compromise among the varied interests of its adherents without interference. A party’s selection of its candidates plays a crucial role in striking such a balance among these interests: The primary election serves as a mechanism to determine the shared political ideals of party adherents by nominating those candidates that best express acceptable views on a wide range of issues. Any state interference with the party primary, including state-mandated inclusion of non-adherents, will distort the compromise struck between the varied interests of party adherents and therefore distort the party’s determination of its shared political beliefs. Freedom of association bars such state control over a political party’s determination of the content of its ideology.

Since control over participation in a primary can profoundly influence the content of the compromise emerging from the primary election, a political party’s ability to define its boundaries cannot be separated from the party’s ability to determine its political ideology. The right of political association, therefore, must protect the freedom of political party members to identify the people who constitute their association and to limit the association to those people. This includes the power to define membership or affiliation requirements in terms of commitment to shared party goals and the ability to determine whether would-be affiliates possess this commitment.

A political party’s power to define its own boundaries is necessary to enable political party members to enjoy the advantages of association and to determine the content of their political speech. Together these powers create a constitutional right of political party adherents to conduct a primary free from the participation of nonadherents. The right to vote in a primary election thus vests only in individuals associated together in pursuit of shared political ideals. (Enfasis suplido.)
*950 El P.N.P. alegó, en su petición de descalificación ante el Tribunal de Primera Instancia, que los Senadores no cum-plieron con los requisitos para ser candidatos, establecidos en la Ley Electoral y en su reglamento, que violaron dicho estatuto, así como los reglamentos del P.N.P.
El Artículo 4.007 de la Ley Electoral, supra, dispone so-bre la forma y manera que se solicita ante el Tribunal de Primera Instancia —y se conducen los procedimientos ante ese foro— la descalificación de un candidato a primarias de un partido político. Sobre ese extremo dispone el referido estatuto lo siguiente:
Todo partido político o candidato que interese descalificar [a] un candidato en primarias deberá radicar ante el Tribunal de Primera Instancia correspondiente una querella de desca-lificación debidamente jurada en [la] cual alegue ambos o al-guno de los siguientes fundamentos:
(1) Que el candidato no ha cumplido con los requisitos para ser candidato establecido en este subtítulo o su reglamento para las primarias con especificación de la sección de la ley o reglamento con la cual no se ha cumplido;
(2) que el candidato ha violado cualesquiera de las disposi-ciones de este subtítulo o de algún reglamento de la Comisión o del partido, con especificación de la sección violada, y
(3) que el candidato no cumple con alguna disposición cons-titucional al respecto.
El candidato impugnado deberá contestar dicha querella, bajo juramento, dentro de lo diez (10) días de haberle sido notificada.
Si el Tribunal de Primera Instancia encontrare que [de] las alegaciones surge una controversia real, deberá citar a vista pública a ser celebrada dentro de los diez (10) días de haberse radicado la contestación del querellado. Dicho término podrá ser reducido por el Tribunal de Primera Instancia, según lo requieran las circunstancias y la justicia del caso. (Enfasis suplido.(45)
Sobre esos extremos, el Art. 4.017 del mismo estatuto dispone lo siguiente:
Cualquier aspirante a ser nominado o cualquier candidato debidamente nominado podrá ser descalificado como tal por el *951 Tribunal de Primera Instancia, cuando no hubiere cumplido con los requisitos impuestos por la Constitución o la ley, o cuando se demostrase que ha violado cualesquiera de las dis-posiciones de este subtítulo o de sus reglamentos.
Radicada una petición de descalificación ante el Tribunal de Primera Instancia, se celebrará una vista en su fondo y el Tribunal deberá resolver de conformidad con los términos es-tablecidos en la sec. 3016a de este título.(46)
El Art. 4.014 del mismo estatuto dispone que todo elector aspirante a una nominación para un cargo público elec-tivo mediante el sistema de primarias debe figurar en el registro de afiliados del partido político que corresponda y prestará juramento ante Notario Público o funcionario au-torizado a tomarlo de que acatará el reglamento oficial de su partido político, y de que cumplirá los requisitos consti-tucionales aplicables y con las disposiciones de tal estatuto.(47)
Los Senadores, aquí peticionarios nos plantean —como hemos expresado previamente— que el P.N.P. les violó su prerrogativas, según la Carta de Derechos del Elector.
El Artículo 2.001 de la Ley Electoral(48) dispone lo si-guiente:
A los efectos de garantizar el libre ejercicio de la franquicia electoral, así como lograr la más clara expresión de la volun-tad del pueblo, declaramos como válidos y esenciales lo si-guientes derechos y prerrogativas;
(1) La administración de los organismos electorales del Es-tado Libre Asociado dentro de un marco de estricta imparcia-lidad, pureza y justicia.
(2) La garantía a cada persona del derecho al voto, igual, libre, directo y secreto.
(3) El derecho del ciudadano al voto íntegro, al voto mixto y al voto independiente bajo condiciones de igualdad en cada caso.
(4) El derecho del elector a participar en la inscripción de partidos y en la inscripción de candidaturas independientes.
*952 (5) El derecho de los electores afiliados a participar en la formulación de los reglamentos internos y bases programáti-cas de sus respectivos partidos políticos, así como en los pro-cesos de elección de las candidaturas de éstos.

(6) El derecho de todo elector afiliado a disentir respecto de las cuestiones de su respectiva colectividad política que no sean de naturaleza programática o reglamentaria.

(7) El derecho de los electores afiliados al debido procedi-miento de la ley en todo procedimiento disciplinario interno, al igual que en los procesos deliberativos y decisiones de sus partidos.

(8) El derecho del elector afiliado aspirante a una candida-tura a solicitar primarias de su partido y la celebración de las mismas con arreglo a las garantías, derecho y procedimientos establecidos en este subtítulo.

(9) El derecho del elector afiliado a recibir información en relación con el uso que su partido dé a los fondos del mismo.

(10) El derecho a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita.

(11) La prevalencia de los derechos electorales del ciuda-dano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas.

La Comisión asumirá la función afirmativa de educar al elector sobre los derechos antes enunciados. A tal fin, se concede por este subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ante el Tribunal de Primera Instancia que corresponda. (Enfasis suplido.(49)
Los Senadores, aquí peticionarios, prestaron juramento para participar en las primarias del P.N.P., celebradas el 9 de noviembre de 2003, y salieron electos en dichas prima-rias como candidatos al Senado de Puerto Rico frente a los comicios electorales de noviembre de 2004. Resultaron electos en dichos comicios generales al Senado bajo la insignia del P.N.P. con el compromiso contraído, como electo-res afiliados, en el referido juramento. El contenido de dicho juramento es el siguiente:
Que acataré y cumpliré los reglamentos, acuerdos, y resolu-ciones aprobadas por los organismos rectores del partido. (En-fasis suplido.)
*953 Los Senadores, aquí peticionarios, prestaron juramento durante el mes de junio de 2007 con la intención de parti-cipar en las primarias del P.N.P. a celebrarse el 9 de marzo de 2008 como candidatos al Senado de Puerto Rico. El con-tenido de dicho juramento es el siguiente:
Que acataré y cumpliré los reglamentos, acuerdos, y resolu-ciones aprobadas por los organismos rectores del partido. (En-fasis suplido.)
El Art. 4 del Reglamento para la Evaluación de Aspiran-tes a Cargos Públicos para Elecciones del P.N.P, aprobado el 20 de mayo de 2007, dispone los requisitos que debe cumplir todo aspirante a ocupar un cargo público por elec-ción representando a los electores de dicha colectividad política. Dicha disposición reglamentaria dispone de la forma siguiente:
A. Ser miembro bonafide del Partido Nuevo Progresista.
B. Ser elector inscrito.
C. Cumplir con las disposiciones constitucionales y legales aplicables al cargo al que aspira.
D. Cumplir con todos los requisitos de la Ley Electoral del 20 de diciembre de 1977, según enmendada, para aspirar a un cargo público por elección.
E. Cumplir con los requisitos del Reglamento de Primarias del Partido para el cargo que aspira.
F. No haber sido convicto por delito grave o menos grave que envuelva violencia o implique depravación moral o deshonestidad.
G. No estar envuelto en actividades contrarias a la ley, la moral o el orden público.
H. No haber sido destituido de cargo o puesto alguno en el servicio público por negligencia en el desempeño de su deber o por alguna otra causa que envuelve deshonestidad o la comi-sión de un acto criminal.
I. Haber cumplido con sus obligaciones contributivas du-rante los últimos 10 años.
J. De no haber sometido planillas de contribución sobre in-gresos durante alguno de los últimos diez (10) años, deberá presentar una declaración jurada al Partido explicando satis-factoriamente, en detalle, la(s) razón(es) para no someter pla-nilla para el (los) año(s) en cuestión.
K. De tener alguna deuda contributiva que no sea la corres-pondiente al segundo plazo de la contribución adeuda [da] du- *954 rante el año corriente, deberá someter evidencia de que tiene un plan de pago aprobado por el Departamento de Hacienda y de que está al día con dicho plan de pago.
L. No haber sido objeto de una recomendación de destitu-ción por la Oficina de Etica Gubernamental, la Comisión de Querellas Municipales, o haber sido separado permanente-mente del ejercicio de su profesión por el Tribunal Supremo. Las Juntas Examinadoras de las diferentes profesiones y ocu-paciones, la Oficina del Comisionado de Instituciones Finan-cieras, el Comisionado de Seguros o cualquier otro organismo administrativo o judicial con facultad para ello.
M. En el caso de funcionarios públicos que aspiren a reelec-ción o a algún cargo electivo, estar al día en la presentación de los informes requeridos por Ética Gubernamental.
N. No estar acusado en los tribunales de la comisión de un delito grave relacionado con el desempeño de un cargo público cuando la acusación surge de señalamientos hechos por la Ofi-cina del Contralor.
O. No haber sometido al Partido información o declaracio-nes juradas cuyo contenido haya sido falso al momento de dicha información o declaración.
P. Someter el formulario requerido por el Partido, debida-mente completado y juramentado, así como la documentación solicitada en dicho formulario [,] o por el Comité de Evalua-ción, dentro de los términos dispuestos por el Reglamento del Partido, por el Directorio del Partido, por este Reglamento o por el Comité de Evaluación.
Q. Comprometerse a respaldar y cumplir con la plataforma, todos los reglamentos, acuerdos, resoluciones y normas estable-cidas por el Partido Nuevo Progresista. (Énfasis suplido.) CT-2007-07, Pieza 4, Reglamento para la Evaluación de Aspiran-tes a Cargos Públicos por Elección, págs. 1405-1406.
El Art. 5 del referido reglamento establece el procedi-miento para la presentación y evaluación de solicitudes para aspirar a un cargo público por elección. Dicha dispo-sición reglamentaria reza de la forma siguiente:
A. Toda persona que aspire a un cargo público por elección tendrá que someterse a evaluación por el Comité de Evaluación designado por el Presidente del Partido y ratificado por el Directorio.
B. Los aspirantes presentarán su solicitud para participar en el procedimiento electoral o de selección correspondiente, en la Secretaría General del Partido, dentro del término fijado por el Partido por ello. El formulario deberá estar debidamente *955 completado en todas sus partes, juramentado y acompañado de los documentos requeridos en el mismo.
C. En caso de que el documento completado y presentado por el aspirante adolezca de alguna información subsanable, el aspirante será notificado de dicha deficiencia por escrito dentro de un término no mayor de cinco (5) días laborables luego de presentado el documento. El aspirante tendrá enton-ces un plazo de cinco (5) días laborables a partir de la fecha de notificación para subsanar la misma. De no subsanarse la de-ficiencia o explicar satisfactoriamente la misma a juicio del Comité de Evaluación, éste último podrá declarar no cualifi-cado al aspirante. El término para subsanar cualquier defi-ciencia podrá ser ampliado por el Comité Evaluador única-mente por justa causa y mediante solicitud del aspirante al Comité [de] Evaluación. La solicitud para extender dicho tér-mino deberá ser presentada en la Secretaría del Partido antes de expirar el término cuya extensión se solicita.

D. El Comité de Evaluación evaluará a los aspirantes y de-terminará si éstos cumplen con los requisitos establecidos por la Ley Electoral, el Reglamento del Partido y el Reglamento de Primarias del Partido Nuevo Progresista y cualquier otro apli-cable para ocupar posiciones electivas por el Partido. La eva-luación de los aspirantes se hará por el Comité de Evaluación en pleno o en secciones, según é ste determine. No obstante lo anterior, todas las decisiones del Comité de Evaluación se ha-rán por mayoría de los miembros del Comité en pleno.

E. El Comité podrá, a su discreción, citar y entrevistar al aspirante a fin de evaluar y hacer su recomendación sobre el aspirante.

F. El Comité podrá adoptar cualquier otra medida que en-tienda necesaria o conveniente para la evaluación y lo investi-gación de los aspirantes.

G. Una vez concluida la evaluación del aspirante, el Comité de Evaluación hará una determinación e informará de ello al Directorio con la recomendación de que tal designación sea ratificada. Las decisiones del Comité de Evaluación serán “Cualificado” o “No Cualificado”.

H. En caso de que la decisión del Comité sea al efecto de que el aspirante no está cualificado, la misma expresará los funda-mentos para ello. El aspirante tendrá un término jurisdiccio-nal de diez (10) días para solicitar del Comité de Evaluación la reconsideración de la determinación o para solicitar una vista. La solicitud de reconsideración o vista deberá hacerse por es-crito y presentarla a la Secretaría del Partido dentro del plazo antes fijo.

I. Recibida la solicitud de reconsideración o de vista, el Co-mité de Evaluación tendrá un plazo de diez (10) días labora-bles para tomar acción sobre la misma o[,] a su discreción, *956 señalar una vista. El Comité de Evaluación podrá designar a un oficial examinador para que presida la vista y someta al Comité de Evaluación su informe y recomendación. El aspi-rante podrá estar asistido por un abogado en cualquier vista fijada por el Comité de Evaluación. En los procedimientos y vistas ante el Comité de Evaluación no serán de aplicación las reglas de procedimientos ni las reglas de evidencia que rigen los tribunales.
Si el Comité de Evaluación no toma acción alguna sobre la solicitud de reconsideración o vista en el término de diez (10) días laborables, luego de su presentación, se entenderá que la misma ha sido declarada sin lugar de plano.

J. En caso de que la decisión del Comité de Evaluación sea confirmando la determinación anterior de no cualificar al as-pirante, o si éste no toma acción sobre la solicitud de reconsi-deración o vista dentro del término aquí fijado, el aspirante tendrá derecho a una apelación ante el Directorio del Partido.

La apelación deberá ser presentada por escrito e incluirá las razones por las cuales el aspirante entiende que la decisión del Comité de Evaluación debe ser revocada. El escrito de apela-ción tendrá que presentarse a la Secretaría del partido dentro del término jurisdiccional de cinco (5) días laborables a partir de la fecha de recibo de la decisión del Comité de Evaluación declarando sin lugar la solicitud de reconsideración. Cuando el Comité de Evaluación no tomare acción sobre la solicitud de reconsideración, el término de cinco (5) días laborables para apelar ante el Directorio comenzará correr al día número once (11) luego de presentada la solicitud de reconsideración o vista ante el Comité de Evaluación.
La decisión del Directorio del Partido declarando con lugar o sin lugar la apelación será final e inapelable.
K. El Directorio del Partido podrá, en cualquier m [o] mentó antes de una elección, No cualificar a un candidato de advenir a conocimiento del Partido que el aspirante ocultó información que debió haber incluido en el formulario de notificación de intención de aspirar, de candidato, o que dio información falsa o que el aspirante no cumple con los requisitos establecidos por la Ley o por este Reglamento. (Énfasis suplido.) CT-2007-07, Pieza 4, Reglamento para la Evaluación de Aspirantes a Cargos Públicos por Elección, págs. 1406-1408.
La Asamblea General de Delegados del P.N.P. aprobó su Reglamento Oficial el 14 de agosto de 2005. Su Declaración de Propósitos expresa lo siguiente:
Como Partido también consideramos valores esenciales la máxima lealtad, el compromiso y la disciplina de los miem- *957 bros, afiliados, oficiales y funcionarios electos bajo la insignia de la Palma.Nuestros reglamentos, esta Declaración de Propó-sitos, los acuerdos, las resoluciones y las decisiones del Partido garantizan a todos sus miembros amplia libertad para exponer sus puntos de vista, preferencias o recomendaciones ante los organismos de la colectividad. Pero una vez se produce la dis-cusión de ideas y los asuntos son sometidos a votación, el deseo democrático de la mayoría se adopta como la posición institu-cional que debe ser respetada y defendida por todos los que voluntariamente pertenecemos a la colectividad. El Partido, como instrumento representativo y aglutinador de más de un millón de electores, siempre estará por encima de opiniones y consideraciones individuales. (Enfasis suplido.(50)
El Art. 5 de dicho cuerpo reglamentario, pág. 2, dispone lo siguiente:
Todo miembro del Partido aceptará y defenderá la Declara-ción de Propósitos y el Programa de Gobierno del Partido. Po-drá, sin embargo, presentar sus propuestas, recomendaciones o posiciones individuales dentro de los organismos correspon-dientes del Partido. No obstante, siempre deberá acatar y defender la Declaración de Propósitos y el Programa de Gobierno vigente. A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general, o que aspire a un cargo en el Directorio del Partido o como Pre-sidente de Comité Municipal o de Precinto, al presentar su intención como aspirante deberá presentar una declaración de fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido. La Decla-ración de Propósitos incluye la lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus *958 acuerdos y resoluciones de conformidad con el Artículo 8. (Én-fasis suplido.(51)
El Art. 8 de dicho cuerpo reglamentario, págs. 3-4, dis-pone lo siguiente:

Todo miembro del Partido acatará y cumplirá los reglamen-tos, acuerdos, resoluciones y Programa de Gobierno aprobados por los organismos rectores del Partido y servirá donde el Par-tido lo considere conveniente, conforme a su preparación, expe-riencia y capacidad, siempre en armonía con los dispuesto en este Reglamento. Se entenderá por “Reglamento de Partido” a éste y todos aquellos que emanen del mismo, incluyendo las resoluciones y acuerdos, y que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.

Todo miembro del Directorio y la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el em-blema del Partido, tienen pleno derecho a expresar con abso-luta libertad sus opiniones o preferencias ante los organismos del Partido a los que pertenece. Pero una vez el asunto es dis-cutido y resuelto y habiéndose tomado una decisión democrá-ticamente por votación mayoritaria del organismo concer-niente, [éjsta se convierte en la posición institucional del Partido, excepto si el organismo la reconsidera o un organismo de superior jerarquía adopta una distinta.

Ningún oficial del Partido podrá menoscabar públicamente o tratar de imponer su criterio personal por encima de la posi-ción institucional que se haya adoptado por el organismo correspondiente.

*959 En casos de indisciplina evidente, temeraria o reiterada, el Directorio tendrá la obligación de censurar o suspender suma-riamente de todos sus cargos en el Partido al oficial que así actúe, incluyendo el retiro de confianza. La suspensión podrá ser temporera o permanente. La decisión que así adopte el Directorio podrá ser apelada, a este organismo, por escrito presentado a la Secretaría dentro de los cinco (5) días a partir de la decisión del Directorio. La apelación resuelta por el Directorio será final y firme en todos los niveles del Partido. (Énfasis suplido.(52)
El Artículo 33(b) de dicho cuerpo reglamentario, pág. 13, dispone lo siguiente:
El Directorio tendrá las siguientes funciones y cualquier otra que emane de este Reglamento o determine la Asamblea General o la Junta Estatal.
*960 b. Será el principal custodio y responsable de la disciplina en el Partido, incluyendo la evaluación y la adjudicación de la lealtad, compromiso y respeto de todos los miembros hacia la Declaración de Propósitos, los reglamentos, resoluciones, acuerdos y compromisos programáticos que se hayan adoptado por votación mayoritaria. (Enfasis suplido.(53)
El Art. 45(c) de dicho cuerpo reglamentario, págs. 27-28, dispone lo siguiente:
Los acuerdos de los Caucus, así como de la Conferencia Le-gislativa, se tomarán por mayoría. Estos acuerdos obligarán a todos los legisladores del Partido, independientemente de su posición personal en el seno del Caucus o de la Conferencia Legislativa, según sea el caso, excepto, cuando los mismos sean contrarios a las disposiciones de este Reglamento, al Pro-grama de Gobierno, a la Ley, la moral o el orden público. El Caucus de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que consideren adecuada contra cual-quier legislador que viole los acuerdos del Caucus o de la Con-ferencia Legislativa. (Énfasis suplido.(54)
El Art. 78 de dicho cuerpo reglamentario, pág. 45, dis-pone lo siguiente:
No podrá ser aspirante ni candidato (a) a cargo público elec-tivo aquella persona que no cumpla con todos los requisitos que *961 establece la Ley Electoral, el Reglamento de Primarias del Par-tido y el Reglamento de Evaluación de Candidatos(as) o que haya sido convicto(a) de delito grave o menos grave, que im-plique depravación moral o deshonestidad o que se dedique a actividades contrarias a la moral o a la ley, o que esté inhabi-litado por ley para ocupar el cargo que aspire.
Aquel candidato o aspirante contra quien el Partido haya radicado un proceso de descalificación de candidatura en el Tribunal, será relevado por el Directorio de toda posición en el Partido al momento de radicarse la demanda.

No podrá ser aspirante o candidato aquella persona que no haya cumplido con la Declaración de Propósitos, resoluciones, reglamentos, acuerdos adoptados por la Asamblea General; y que haya sido sancionado de forma sumaria y permanente, según el Reglamento del Partido.

No podrá aspirar a ocupar la presidencia de un organismo, según definido por el Título III, Artículo II, exceptuando el punto 3 del inciso II “Comité de Sectores” o ser designados(as) para ocuparla, personas que hayan estado involucradas en conducta que impliquen depravación moral o uso de fondos públicos para lucro personal o que hayan sido destituidos de puestos públicos por elección o designación en el Gobierno de Puerto Rico o de los Estados Unidos.
Ningún fimcionario(a) remunerado(a) del Partido o cual-quiera de sus organismos, podrá postularse a puesto electivo. (Énfasis suplido.)
El Art. 98(a) de dicho cuerpo reglamentario, pág. 53, dispone, en lo pertinente, lo siguiente:
Toda aquella persona que desacate una decisión de la Asam-blea General no podrá figurar como candidato bajo la insignia del Partido, ni ocupar posiciones de liderato. (Énfasis suplido.)
La Ley Electoral, en su Art. 4.007, supra, permite que un partido político o candidato que interese descalificar un candidato de esa colectividad política en primarias pre-sente ante el Tribunal de Primera Instancia una querella de descalificación debidamente jurada en la cual alegue, entre otras cosas, que el candidato ha violado cualesquiera de las disposiciones de algún reglamento de su partido político. Por otro lado, ese mismo estatuto en su Art. 4.014, supra, obliga a todo aspirante a una nominación a un cargo público por elección mediante el sistema de primarias a *962 estar registrado como elector afiliado del partido político que corresponda y a prestar juramento de que acatará el reglamento oficial de su partido político, entre otras cosas. Los Senadores, aquí peticionarios, prestaron juramento —para participar en las primarias celebradas el 9 de no-viembre de 2003 y en junio de 2007 para participar en las primarias a celebrarse el 9 de marzo de 2008, de que aca-tarían y cumplirían no sólo los reglamentos del P.N.P. sino también los acuerdos y las resoluciones aprobadas por los organismos rectores de esa colectividad política.
El 4 de agosto de 2005, el P.N.P, al aprobar a través de su Asamblea General de Delegados su Reglamento Oficial, en su Declaración de Propósitos formuló como valores esenciales la máxima lealtad, el compromiso y la disciplina de sus miembros, electores afiliados y funcionarios electos, entre otros. No obstante, se estableció como prerrogativa de todos sus miembros, y así se obligó como institución a garantizarlo, la amplia libertad para exponer sus puntos de vista, preferencias o recomendaciones ante los organis-mos y foros de la colectividad. Por otro lado, obligó a todos sus miembros —que pertenecen voluntariamente a esa co-lectividad política— a que una vez en uso de su libertad, expongan sus puntos de vista, preferencias o recomenda-ciones dentro de los organismos y foros internos del par-tido, respeten y defiendan la voluntad democrática de la mayoría. Una vez se produce la discusión de ideas ante los organismos y foros internos del P.N.P., y los asuntos consi-derados, discutidos y debatidos son sometidos a votación, la voluntad democrática de la mayoría se adopta como la posición institucional que, a su vez, obliga a todos sus miembros y tiene que ser respetada y defendida por los mismos. La condición de miembro o elector afiliado de un partido político es voluntaria. No obstante, tal condición está sujeta a la adhesión, compromiso, lealtad y disciplina con las posiciones institucionales de esa colectividad política. En su Artículo 5, el Reglamento Oficial de la Asamblea de Delegados le impone la obligación a todo *963 miembro del partido a aceptar y defender la Declaración de Propósitos del Partido, entre otros. Le impone la obliga-ción, a todo elector afiliado que aspire a una posición elec-tiva bajo su insignia en una elección general, a prestar una declaración de fidelidad (juramento) al presentar su inten-ción como aspirante, en la que tiene que hacer constar su compromiso con los principios contenidos en la referida De-claración de Propósitos, que incluye su lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones. Los Senadores, aquí peticionarios, hicieron tal compromiso en ambas de-claraciones de fidelidad, previamente expuestas.

El Art. 8 del referido reglamento le impone la obligación a todo miembro del partido a acatar y cumplir los regla-mentos, acuerdos, resoluciones y Programa de Gobierno aprobados por los organismos rectores del partido. Dispuso que se entiende por “Reglamento de Partido” a éste y todos aquellos que emanen del mismo, incluso las resoluciones y los acuerdos que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.

El Art. 45(c) del referido reglamento impone la obliga-ción de todos los legisladores electos bajo su insignia, inde-pendientemente de su posición personal en el seno del Caucus o de la Conferencia Legislativa, a respetar y defender los acuerdos de esos dos organismos tomados por mayoría. El Caucus de cada Cámara legislativa, así como el Directorio, pueden tomar la acción disciplinaria que con-sideren adecuada contra cualquier legislador que viole los acuerdos del Caucus o de la Conferencia Legislativa. Los legisladores del P.N.P. tienen amplia libertad, que les ga-rantiza la Declaración de Propósitos del Reglamento Ofi-cial de esa colectividad política, para exponer sus puntos de vista, preferencias o recomendaciones ante el seno del Caucus o de la Conferencia Legislativa. No obstante, una vez se adopta por mayoría la posición institucional del par-tido, ésta obliga a todos los miembros del Caucus o de la Conferencia Legislativa, según sea el caso. El Art. 33(b) *964 delega en el Directorio del P.N.P. la autoridad disciplinaria sobre todos sus miembros, incluso la evaluación y adjudi-cación de la lealtad, el compromiso y respeto de éstos hacia la Declaración de Propósitos, los reglamentos, las resolu-ciones, los acuerdos y los compromisos programáticos que se hayan adoptado por votación mayoritaria.
El Art. 78 del referido reglamento dispone que no podrá ser aspirante a una candidatura electiva en las primarias del P.N.P. —a celebrarse el 9 de marzo de 2008— o candi-dato por ese partido político en las elecciones generales de noviembre de 2008, aquella persona que no cumpla con to-dos los requisitos que establece, entre otras cosas, el Regla-mento de Evaluación de Candidatos. Este último dispone en el Art. 4(Q), que los aspirantes deben comprometerse a res-paldar y cumplir con la plataforma, todos los reglamentos, los acuerdos, las resoluciones y las normas establecidas por esa colectividad política. Dispone, además, el Art. 78 que aquella persona que no haya cumplido con la Declaración de Propósitos, las resoluciones, los regalementos o los acuerdos adoptados por la Asamblea General no podrá ser aspirante a un puesto electivo en las primarias del P.N.P. o candidato a ningún puesto electivo en las elecciones generales de no-viembre 2008 por ese partido. Sobre esos extremos, añade el Art. 98(a), que toda persona que desacate una decisión de la Asamblea General del P.N.P. no podrá figurar como candi-dato bajo su insignia, ni ocupar posiciones de liderato.
El Comité de Evaluación de Candidatos del P.N.P. con-cluyó, a base del expediente y los hechos probados ante sí, que los Senadores, aquí peticionarios, a partir de enero del 2005 incurrieron en conducta temeraria y lesiva al P.N.P. Que no acataron, respetaron y defendieron decisiones to-madas por la mayoría del Caucus del P.N.P. en el Senado de Puerto Rico. Que crearon una alianza con Senadores de otros partidos, despojando al P.N.P. y a su delegación en el Senado de la mayoría legislativa que obtuvieron en las ur-nas el 2 de noviembre de 2004. Que con sus actuaciones se colocaron al margen del P.N.P, así como también en con- *965 traposición política, reglamentaria y programática a esa colectividad política, en violación a su declaración de fide-lidad (juramento) prestada en el 2003, y a las normas que delinean la conducta de los miembros afiliados, según los Arts. 5 y 8 del Reglamento Oficial del P.N.P., supra.
Determinó el Comité que el Caucus en el Senado del RNR. y los organismos rectores de esa colectividad, de mayor representación de sus miembros afiliados, decidieron por mayoría y en forma democrática, que los intereses po-líticos, estratégicos, reglamentarios y programáticos de esa colectividad estarían mejor servidos otorgando la Presiden-cia del Senado al Presidente del P.N.P.
Concluyó el Comité que los Senadores, aquí peticiona-rios, promovieron, junto a legisladores de partidos políticos de minoría y de oposición, la aprobación de legislación cuyo contenido el P.N.P. consideró lesivo para el Pueblo de Puerto Rico, como su posición oficial e institucional. Ejem-plo de ello es la tasa contributiva sobre las ventas y los servicios impuestos por ley, en contraposición a la pública y ferviente oposición institucional del P.N.P. Determinó que todo ello fue para complacer a los senadores de los partidos políticos minoritarios de oposición que los mantienen en sus posiciones de liderato en el Senado.
Concluyó, además, que los Senadores, aquí peticiona-rios, carecen de credibilidad porque violaron su propia de-claración de fidelidad. Determinó, que son electores afilia-dos al P.N.P. por conveniencia momentánea para adelantar sus aspiraciones personales de reelección. Pretenden vol-ver a utilizar la insignia y los recursos de esa colectividad política sin el compromiso real y efectivo de representar a sus electores afiliados en los principios e ideales políticos que le son comunes. Determinó, además, que el P.N.P. no prestará su emblema o insignia a aspirantes o candidatos que actúen por conveniencia personal y en perjuicio polí-tico, reglamentario y programático de la colectividad polí-tica a la que juraron lealtad y fidelidad institucional.
*966 Por último concluyó que los Senadores, aquí peticiona-rios, no cumplen con los requisitos de idoneidad, valores, principios, compromisos, lealtades y fidelidad a las posicio-nes políticas de naturaleza institucional del P.N.P. por ha-ber violado los citados Arts. 5, 8 y 45 del Reglamento Ofi-cial de esa colectividad política.
Recomendaron al Directorio del P.N.P. no cualificar la in-tención de los Senadores para participar en las primarias a celebrarse el 9 de marzo de 2008 —como aspirantes a las candidaturas a escaños al Senado de Puerto Rico— por me-diar violaciones claras y evidentes de esas personas a los Arts. 5, 8 y 45 del Reglamento Oficial del P.N.P., supra. El Directorio acogió las recomendaciones del Comité, inclusive aquella de no considerarlos miembros afiliados de esa colec-tividad política.
El Tribunal de Primera Instancia concluyó que la deci-sión del Directorio del P.N.P., en relación con su determi-nación sobre la violación de los aquí peticionarios a las disposiciones reglamentarias de esa colectividad política, por falta de disciplina, lealtad y compromiso de su parte hacia la Declaración de Propósitos de su cuerpo reglamen-tario y por no acatar la decisión de la Asamblea General no fue arbitraria ni caprichosa. Reconoció la decisión del P.N.P. como un ejercicio de su derecho fundamental a la libertad de asociación, y de su prerrogativa de regular y de cualificar la intención de personas de aspirar a candidatu-ras bajo la insignia de esa colectividad, para representar sus electores afiliados y divulgar su plataforma, mensaje, ideología y programa.
Lo dictaminado por el Tribunal de Primera Instancia, que avaló lo actuado por el Directorio del P.N.P, está cobi-jado bajo la presunción de corrección. Los Senadores, aquí peticionarios, no han rebatido en forma alguna tal presunción. No han colocado a este Tribunal en posición de intervenir con la sentencia que dictó el foro primario.
Las prerrogativas contenidas en la Carta de Derechos del Elector no le brindan un derecho absoluto a un miem- *967 bro afiliado a un partido político a participar en sus primarias. Un elector afiliado tiene el derecho a disentir res-pecto de las cuestiones de su respectiva colectividad política que no sean programáticas o reglamentarias, o sea de natu-raleza institucional. Tiene el derecho a un debido procedi-miento de ley en todo procedimiento disciplinario interno, al igual que en los procesos deliberativos y en las decisiones de su partido. Tiene el derecho a aspirar a una candidatura, a solicitar primarias y a celebrarlas con arreglo a las garan-tías, el derecho y los procedimientos establecidos en la Ley Electoral de Puerto Rico. No obstante, según el Art. 4.007 de la Ley Electoral, supra, tiene que cumplir con los requisitos establecidos en la Ley Electoral y su reglamento. Puede ser descalificado como tal, de determinarse que ha violado cua-lesquiera de las disposiciones de la Ley Electoral, de algún reglamento de la Comisión Estatal de Elecciones o de su par-tido político. Tendrá, además, que prestar una declaración de fidelidad, bajo juramento, de que acatará el reglamento oficial de su partido político. Al violar esa declaración de fidelidad ofrecida bajo juramento inflinge el Art. 4.014 de la Ley Electoral, supra, y podría también ser descalificado como aspirante a una candidatura en unas primarias.
Los Senadores, aquí peticionarios, violaron los acuerdos del Caucus del P.N.P. en el Senado que fueron adoptados por la mayoría de sus miembros y, por ende, violaron la declaración de fidelidad que prestaron bajo juramento para poder aspirar a una candidatura al Senado de Puerto Rico en las primarias celebradas el 9 de noviembre de 2003. Esos acuerdos los obligaban a ellos, independientemente de su posición personal en el seno del Caucus. Al así actuar quedaron expuestos a la acción disciplinaria que el Direc-torio del P.N.P. considerara adecuada; Art. 45(c) del Regla-mento Oficial del P.N.P. También violaron los acuerdos to-mados por la Asamblea General del P.N.P. al no mostrar fidelidad, quedando expuestos igualmente a la acción dis-ciplinaria de ese organismo.
*968 Al desacatar los acuerdos de la Asamblea General y del Caucus del P.N.P. en el Senado, los Senadores no cualifica-ron para participar en las primarias de ese partido político; Arts. 45(c), 78 y 98(a) del Reglamento Oficial del P.N.P.
Existe un interés público de gran importancia en Puerto Rico, dimanante del esquema democrático constitucional que vivimos, que impone y exige la restricción judicial al determinarse cuál es el cuadro de aspirantes en una pri-maria interna de un partido político y los candidatos que deben figurar en su papeleta electoral, frente a los comicios generales celebradas en Puerto Rico cada cuatro años. Ese interés público está mejor servido en permitir que tal pro-ceso político electoral interno de los partidos políticos opere y funcione libre de la intervención judicial. Los tribunales solo habrán de intervenir cuando medien violaciones cra-sas a derechos individuales de naturaleza constitucional o estatutaria que obstaculicen o impidan la función repre-sentativa y democrática de los partidos políticos en nuestra democracia constitucional.
Los partidos políticos poseen determinadas facultades de gobierno propio y están investidos con una amplia dis-creción para formular e interpretar su reglamentación in-terna y resolver sus disputas al amparo de la misma
La libertad de asociarse en la forma de partidos políticos, para la promoción y el progreso de creencias, valores, prin-cipios e ideales políticos comunes necesariamente presu-pone la libertad de identificar las personas que constituyen esa asociación, a base de esos valores, principios e ideas po-líticas comunes. La participación de personas en los proce-sos internos de naturaleza política electoral que no estén comprometidos con los mismos, y han violado declaraciones de fidelidad prestadas bajo juramento a esos efectos, afecta y distorsiona sus decisiones y acciones colectivas, perjudi-cando seriamente las funciones esenciales y fundamentales de los partidos políticos —de naturaleza representativa— dentro de nuestra democracia constitucional. Concluimos que los partidos políticos tienen la facultad y el poder de *969 protegerse de la penetración o intrusión interna de creen-cias, valores, principios e ideas políticas adversas a su asociación. Cualquier interferencia o intrusión con la liber-tad de asociación, sobre la base de las creencias, valores y principios e ideales políticos comunes de un partido político es simultáneamente una interferencia o intrusión con la misma libertad de sus miembros afiliados.
La libertad de asociación resultaría en una garantía hueca y sin valor en nuestra democracia constitucional si los partidos políticos no pudieran limitar la participación y tener el control de sus decisiones colectivas a través de aquellos que comparten las creencias, los valores, princi-pios e ideales políticos que constituyen su asociación.
¿Quién es el árbitro final sobre si un aspirante a una candidatura al Senado de Puerto Rico en las primarias in-ternas de un partido político, de conformidad con los valo-res y requisitos que establece esa misma organización, de acuerdo con la ley, está cualificado para participar en las mismas? Concluimos que el propio partido político, no los tribunales, así como tampoco cualquier persona que desee aparecer en la papeleta de esa colectividad política. Los Tribunales podemos intervenir con los asuntos de un par-tido político cuando se violan derechos individuales de na-turaleza constitucional o estatutarios que obstaculicen o impidan la operación y el funcionamiento de nuestra demo-cracia constitucional, de naturaleza representativa. Tal asunto descansa plenamente dentro de los límites consti-tucionales permisibles de la actividad de los partidos polí-ticos sobre quién puede representar efectiva y eficiente-mente las creencias, los valores, los principios y los ideales políticos de su asociación. Los tribunales no tienen, por impedimento constitucional, facultad para formular opi-nión o adjudicar tal asunto.
No existe un ejemplo más claro de una interferencia o intrusión indebida del Estado en los procesos políticos elec-torales internos de un partido político que una reglamen-tación o decisión judicial que obligue a esa colectividad po- *970 lítica a aceptar la intención de participar a personas en sus primarias cuando esa organización entiende que no cuali-fican para ello, según sus creencias, valores y principios. Tal acción del Estado interfiere, impide y hasta obstaculiza la habilidad de sus miembros afiliados de expresar y pro-mover aquellos valores y puntos de vista comunes que los llevaron a asociarse. Tal libertad milita a favor de permitir a los partidos políticos limitar el acceso a sus primarias internas únicamente a aquellas personas que representan sus creencias, valores, principios e ideales políticos y a ex-cluir del proceso político electoral interno a aquellas que no.
El derecho constitucional a asociarse libremente a base de criterios políticos incluye el poder y la facultad de un partido político de requerir y obtener un compromiso de sus miembros afiliados, mediante una declaración de fide-lidad juramentada sobre las creencias, los valores, los prin-cipios y los ideales políticos formulados democráticamente por la asociación, por mayoría, independientemente de la variedad de intereses individuales que éstos tengan. In-cluye exigir a sus miembros afiliados la no interferencia de sus intereses personales con los intereses y asuntos comu-nes de la asociación.
El control de un partido político sobre la participación de personas en sus primarias internas influencia profun-damente la sustancia y el contenido del compromiso de los candidatos que resultan victoriosos en ese proceso político electoral. La capacidad y habilidad de un partido político de definir sus fronteras no puede ser separada de su capa-cidad y habilidad para determinar y formular sus valores, principios e ideales políticos. El poder y la facultad de los partidos políticos de definir sus propias fronteras es nece-sario e indispensable para habilitar a sus miembros afilia-dos en el disfrute de las ventajas de tal asociación, y para determinar el contenido de su discurso político. El ejercicio en conjunto de esos poderes y facultades viabilizan el dis-frute del derecho de los miembros afiliados de un partido *971 político a conducir el procedimiento interno de primarias, libre de la interferencia de la oposición política, o aún de aquellas personas que no comparten o no están comprome-tidas con las creencias, los valores y los principios de la asociación.
Al examinar un estatuto es deber y obligación ineludible de los Tribunales lograr interpretaciones congruentes y compatibles con el espíritu y esquema democrático de la Constitución de Puerto Rico.(55) Al interpretar las partes antes mencionadas de la Ley Electoral de Puerto Rico, de-bemos imprimirle sentido y valor real a la libertad de aso-ciación que tienen los partidos políticos y sus miembros como instrumento de la democracia constitucional, de la naturaleza representativa que vivimos.
Por todo lo antes expuesto, disentimos del curso de ac-ción tomado por la Mayoría.

 16 L.P.R.A. see. 3001 et seq.

 31 L.P.R.A. see. 3343.

 Pagan Hernández v. U.P.R., 107 D.P.R. 720 (1978); Pereira v. Hernández, 83 D.P.R. 160 (1961).

 J.M. Manresa, Comentarios al Código Civil español, 6ta ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 283.

 Íd., pág. 288.

 Autoridad de Acueductos v. Reyes, 77 D.P.R. 10, 14-16 (1954); Silva v. Doe, 75 D.P.R. 209, 214 (1953); Vidal v. Monagas, 66 D.P.R. 622 (1946); Junta Insular de Elecciones v. Corte, 63 D.P.R. 819 (1944); Lausell Marxuach v. Díaz de Yáñez, 103 D.P.R. 533 (1975); Pagán Hernández v. U.P.R., supra.

 Lausell Marxuach v. Díaz de Yáñez, supra, pág. 535, citando a E. Jiménez Asenjo, Sobre el Alcance Real de la Cosa Juzgada, 184 Rev. Gen. de Leg. y Juris. 63, 73, n. 1 (1948).

 Manresa y Navarro, op. cit., pág. 299.

 Lausell Marxuach v. Díaz de Yáñez, supra, pág. 536. Véase, además, Manresa y Navarro, op. cit., pág. 308.

 A & P Gen. Contractors v. Asoc. Caná, 110 D.P.R. 753, 765 (1981).

 Manresa y Navarro, op. cit., pág.319.

 Íd., pág. 295.

8) Íd., pág. 297.

 83 D.P.R. 494, 507 (1961).

 Mercado Riera v. Mercado Riera, 100 D.P.R. 940 (1972).

 Méndez v. Fundación, 165 D.P.R. 253 (2005).

 Pérez v. Bauzá, 83 D.P.R. 220 (1961).

 Citando a Universal Const. Co. v. City of Fort Lauderdale, 68 So.2d 366 (Fia. 1953).

 Vidal v. Monagos, supra.

 Riera v. Riza, 85 D.P.R. 268, 274 (1962); Suárez Fuentes v. Tribunal Superior, 88 D.P.R. 136 (1963); Feliciano Ruiz v. Alfonso Develop. Corp., 96 D.P.R. 108, 114 (1968); Pagán Hernández v. U.P.R., supra, pág. 736; Millón v. Caribe Motors Corp., supra, pág. 509.

 Meléndez v. García, 158 D.P.R. 77, 92 (2002).

 Pagán Hernández v. U.P.R., supra, pág. 736.

 Meléndez v. García, supra.

 Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 280.

 Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881, 887 (1993).

 Íd., págs. 887-888; López Vives v. Policía de P.R., 118 D.P.R. 219 (1987).

 Íd.

 Rivera Rodríguez & Co. v. Lee Stowell, supra.

 Cleveland Bd. Of Educ. v. Lauderhill, 105 S.Ct. 1487, 1493 (1985).

 Íd.

 Salvá Santiago v. Torres Padró, 171 D.P.R. 332 (2007).

 O’Brien v. Brown, 409 U.S. 1, 4 (1972). Véanse, también: Irish v. Democratic-Farmer-Labor Party of Minnesota, 399 F.2d 119 (8vo Cir. 1968).

 State Ex Bel. Holland v. Moran, 865 S.W. 2d 827, 832 (Mo. App. W.D. 1993); Carney v. Pilch, 296 A. 2d 687, 688 (1972).

 Íd.

 Logia Adelphia v. Logia Adelphia, 72 D.P.R. 488, 503 (1951).

 L.H. Tribe, American Constitutional Law, Ira ed., Nueva York, Ed. The Foundation Press, 1978, pág. 791.

 Íd.

 Giménez v. J.E.E., 96 D.P.R. 943, 947 (1968).

 Dávila v. Secretario de Estado, 83 D.P.R. 186, 194 (1960).

 Kusper v. Pontikes, 414 U.S. 51, 58 (1973).

 EU. v. San Francisco Democratic Comm., 489 U.S. 214, 229 (1989).

 Logia Adelphia v. Logia Adelphia, supra, pág. 496.

 González Reyes v. Romero Barceló, 114 D.P.R. 406, 414 (1983).

 Nota, Primary Elections and the Collective Right of Freedom of Association, 94 (Núm. 1) Yale L. J. 117, 125-127 (1984).

 16 L.P.R.A. see. 3157.

 16 L.P.R.A. see. 3167.

 16 L.P.R.A. see. 3164.

 16 L.P.R.A. see. 3051.

 Íd.

 La Declaración de Propósitos disponía en el Reglamento Oficial del P.N.P. aprobado el 26 de agosto de 2001 de la forma siguiente:
“Como Partido también consideramos valores esenciales la máxima lealtad, el compromiso y la disciplina de los miembros, afiliados, oficiales y funcionarios electos bajo la insignia de La Palma. Nuestros reglam'entos, esta Declaración de Propósitos, los acuerdos y las resoluciones del Partido garantiza a todos sus miembros amplia libertad para exponer sus puntos de vista, preferencias o recomendaciones ante los organismos de la colectividad. Pero una vez se produce la discusión de ideas y los asuntos son sometidos a votación, el deseo democrático de la mayoría se adopta como la posición institucional que debe ser respetada y defendida por todos los que volun-tariamente pertenecemos a la colectividad. El Partido, como instrumento represen-tativo y aglutinador de más de un millón de electores, siempre estará por encima de opiniones y consideraciones individuales.”
En el Reglamento aprobado el 14 de agosto de 2005, se añadió, en la segunda oración, la frase “las decisiones del Partido”.

 El Art. 5 disponía en el Reglamento Oficial del RN.R aprobado el 26 de agosto de 2001 de la forma siguiente:
“Todo miembro del Partido aceptará y defenderá la Declaración de Propósitos y el Programa de Gobierno del Partido. Podrá, sin embargo, presentar sus propuestas, recomendaciones o posiciones individuales dentro de los organismos correspondien-tes del Partido. No obstante, siempre deberá acatar y defender el vigente. A esos fines, toda persona que aspire a una posición electiva bajo la insignia del Partido en una elección general, excepto el Legislador Municipal, o que aspire a un cargo en el Directorio del Partido o como Presidente de Comité Municipal o de Precinto, al pre-sentar su intención como aspirante deberá presentar una declaración de fidelidad en la que hace constar su lealtad a la Declaración de Propósitos y al Programa de Gobierno del Partido. La Declaración de Propósitos incluye la lealtad total a los principios de disciplina y respeto a los reglamentos de la colectividad, sus acuerdos y resoluciones.”
En el Reglamento aprobado el 4 de agosto de 2005, se añadió en la tercera oración la frase “Declaración de Propósitos y el Programa de Gobierno vigente”. En la última oración se añadió la frase “de conformidad con el Artículo 8”. En el Regla-mento del 2001, en la cuarta oración, se eliminó la frase “excepto el Legislador Municipal”.

 El Art. 8 aprobado el 26 de agosto de 2001, disponía lo siguiente:
“Todo miembro del Partido acatará y cumplirá los reglamentos, acuerdos y re-soluciones aprobadas por los organismos rectores del Partido y servirá donde el Par-tido lo considere conveniente, conforme a su preparación, experiencia y capacidad, siempre en armonía con lo dispuesto en este Reglamento. Se entenderá por ‘Regla-mento de Partido’ a éste y todos aquellos que emanen del mismo, incluyendo las resoluciones y acuerdos, y que sean aprobados por la Asamblea General, la Junta Estatal o el Directorio.
“Todo miembro del Directorio y la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con absoluta libertad sus opiniones o preferencias ante los organismos del Partido a los que pertenece. Pero una vez el asunto discutido es resuelto o adoptado democráticamente por votación mayoritaria del organismo concerniente, esa se con-vierte en la posición institucional del Partido. Ningún oficial del Partido podrá me-noscabar públicamente o tratar de imponer su criterio personal por encima de la posición institucional que se haya adoptado por la colectividad. En casos de disci-plina evidente, temeraria o reiterada, el Directorio tendrá la obligación de censurar o suspender sumariamente de su cargo al oficial que así actúe, incluyendo el retiro de confianza. La suspensión podrá ser temporera o permanente. La decisión que así adopte el Directorio podrá ser apelada, a este organismo, por escrito presentado a la Secretaría dentro de los cinco (5) días a partir de la decisión del Directorio. La apelación resuelta por el Directorio será final y firme en todos los niveles del Partido.”
En el Reglamento aprobado el 14 de agosto de 2005 se añadió en la primera oración la frase “y Programa de Gobierno”. La segunda oración del segundo párrafo se enmendó para que ahora disponga “Pero una vez el asunto es discutido y resuelto y habiéndose tomado una decisión democráticamente por votación mayoritaria del organismo concerniente, [é]sta se convierte en la posición institucional del Partido, excepto si el organismo la reconsidera o un organismo de superior jerarquía adopta una distinta”. La primera oración, del tercer párrafo se enmendó para que ahora disponga “por el organismo correspondiente”. La primera oración del cuarto párrafo se enmendó para que disponga “de todos sus cargos en el Partido al oficial que así actúe, incluyendo el retiro de confianza”.

 El Art. 33(b) aprobado el 26 de agosto de 2001, disponía de la forma si-guiente:
“Será el principal custodio de la disciplina en el Partido, incluyendo la evalua-ción y la adjudicación de la lealtad, compromiso y respeto de todos los miembros hacia la Declaración de Propósitos, los reglamentos, resoluciones, acuerdos y com-promisos programáticos que se hayan adoptado por votación mayoritaria.”
En el Reglamento aprobado el 14 de agosto de 2005 se añadió en la primera oración la frase “y responsable”.

 El Art. 45(c) aprobado el 26 de agosto de 2001, disponía de la forma si-guiente:
“Los acuerdos de los Caucus, así como de la Conferencia Legislativa se tomarán por mayoría. Estos acuerdos obligarán a todos los legisladores del Partido, indepen-dientemente de su posición personal en el seno del Caucus o de la Conferencia Le-gislativa, según sea el caso, excepto, cuando los mismos sean contrarios a las dispo-siciones de este Reglamento, a la Ley, la moral o el orden público. El Caucus de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que consideren adecuada contra cualquier legislador que viole los acuerdos del Caucus o de la Con-ferencia Legislativa.”
En el Reglamento aprobado el 14 de agosto del 2005 se añadió en la segunda oración la frase “al Programa de Gobierno”.

 Nogueras v. Hernández Colón, 127 D.P.R. 405 (1990).